Pee Curiam :
These cases were referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 134(h). The commissioner has done so in an opinion and report filed on November 17,1970. On December 7, 1970, plaintiffs filed a notice of intention to take exceptions to the commissioner’s report and their time to file exceptions and brief was extended to March 8, 1971. On March 19,1971, defendant filed a motion requesting that the court adopt the report of the commissioner as the basis for its judgment pointing out that plaintiffs have not filed exceptions and brief and that the extended time for so filing has expired.
Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, it hereby adopts the same, as hereinafter set forth, as the basis for its judgment in these cases without oral argument. Therefore, *891 plaintiffs are not entitled to recover and the petitions are dismissed.
OPINION OK COMMISSIONER
Fletcher, Gommissioner: In these consolidated cases, twenty-three civilian employees of the Department of the Navy seek to recover overtime compensation under the provisions of 5 U.S.C. §§ 6730 and 913 (1964 ed.), codified in 1966 as 5 U.S.C. §§ 5544 and 6102. All plaintiffs were employed in various capacities aboard vessels operated by the Naval Ordnance Laboratory Test Facility at Ft. Lauderdale, Florida (nolte), and their overtime claim is based on the allegation that during the six-year period prior to October 18, 1964, they were not allowed a nonwork lunch period. For the reasons set forth in the following detailed and ultimate findings of fact and conclusions of law, it is concluded that plaintiffs are not entitled to recover.
Findings oe Fact
1. The facts in these cases have been partially stipulated by the parties. The factual areas in dispute were the subject of a five-day trial held at the Naval Ordnance Laboratory Test Facility, Ft. Lauderdale, Florida (noltf) . Pursuant to then Bule 47(c) (now Buie 131(c)), the parties, with the approval of the commissioner, agreed that there should be a separate determination of the right of plaintiffs to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
2. noltf, where plaintiffs were employed during the period here involved, is a field station and subordinate activity of the United States Naval Laboratory at White Oak, Maryland (NOL). nolte was established by the Department of the Navy on September 8,1952. Since a large portion of its testing operations are conducted at sea, noltf was assigned a number of boats which will be described below. The plaintiffs in the Bennett case are, or were, members of boat crews at times relevant to this case. Their primary duties were concerned with the operation and maintenance of these boats. The plaintiffs in the Allwein case, on the other hand, are, or *892 were, members of the task crew at times relevant to this case, and their primary duties were concerned with assisting the engineers and scientists in the conduct of testing operations from the boats. The members of the task crew normally have no function in the operation or maintenance of the boats themselves.
3. The Noltf flotilla since 1958 has consisted of various craft which were used to assist in carrying out the mission of the noltf. The following boats were included in the flotilla at various times. The dates in parentheses under the official title of each boat show the inclusive dates during which that vessel was a part of the noltf flotilla.

4. The Mine Diming Tender TDT-9.
a. The Mine Diving Tender is involved in three primary activities: (1) as a communications craft; (2) as a platform and embarkation point for divers and diving equipment, and (3) as a base for underwater television equipment.
b. The communications equipment on the xdt-9 is maintained by the station electronics group, not the boat crew. It is operated by a station engineer during aircraft operations. The station engineers are professional engineers, GS-11 to 13, who are either on the noltf or the nol technical staffs. However, during operations which do not involve aircraft, the ship to shore radio-telephone and the FM radio may be operated by members of the boat crew.
*893 c. The ydt-9 also serves as a platform and embarkation point for divers and their equipment. As a diver’s platform the ydt-9 is usually, but not always, at anchor.
d. The equipment on the ydt-9 includes three suitable propulsion engines, generators, a decompression chamber for divers, three heavy anchors and winches, a crane, and other miscellaneous items suitable to its mission.
e. The ydt-9 has a galley equipped for making coffee and warming lunch-type items. The craft is not equipped for serving a full mess. There originally were three bunks on the ydt-9. Two of these, however, have been removed. These bunks were and are used solely by the divers, who use them for resting during the one-day trips that the craft makes. It has, however, no other facilities for overnight expeditions.
f. The NOLte personnel who usually work on the ydt-9 are of three types: the regular boat crew needed to operate the vessel, the regular ordnance or task crew, and the technical personnel who perform the testing mission of the boat. The boat crew usually consists of one motor vessel captain (the captain of the boat), one marine engineman, one motorboat engineman, and two helpers general. The regular task crew on the boat generally consists of between two and five ordnancemen of various types, and one helper general. In addition to these people, there are usually one engineer development technician (electronics), one engineer technician (plotter), and one or two engineers. The boat crew on the ydt-9 always consists of the five men described above. However, the number and types of other men aboard on any given trip depend upon the work to be done on that particular trip.
5. Large Buoy Boat (6ND-H6).
The crew personnel aboard the 6ND-146 are a captain and a marine engineman. In addition, when the vessel is laying cable and planting or recovering mines, two to four ordnancemen are carried on the vessel as a task crew. One of the primary functions of 8ND-146 is to lay cable. The other prime function of this boat is to plant and recover ordnance units and cable distribution boxes. Secondary functions are as a tow boat, diving or instrument platform or air *894 drop control boat. If there is no work for the boat, the men normally work on her maintenance. The duties of the personnel aboard the 6ND-146 are similar to those aboard the xdt-9.
6. The Utility Boats.
The personnel aboard the utility boats is comprised of a captain and one engineman. The utility boats give assistance to the xdt-9 and to the cable and mine layer (6ND-146), and they also act as safety boats. They help tend the divers, and are used as tow boats and for “picking up” duty when there are airdrops of ordnance items. They also act as safety boats for mine sweepers. At various times the utility boats function as picket boats and warn off straying vessels in the area.
7. LOU (Landing Graft Utility).
The lctj was borrowed from the Army. It was equipped with bunks and mess facilities which were not used, but were not removed because the vessel belonged to and was to be returned to the Army. The lcu had the same functions and crew complement as the ydt-9.
8. Miscellaneous Other Boats.
The NOLte also had other small boats in its flotilla, such as Motor Torpedo Betrievers, AVR’s, and a picket boat. Generally, the crews of these boats were comprised of a motorboat captain and a motorboat engineman. Also, when the project required it, there would be one or two men aboard from the task crew. With one exception, they had no galleys other than a hotplate. The functions of these boats and the duties of the personnel aboard them, were very similar to those of the utility boats. See finding 6.
9. The primary function of the boat crew employees of NOlte is to maintain and operate the Nolte flotilla. The boat crew employees themselves neither plant and recover ordnance devices nor conduct airdrop operations. They do, however, transport the engineers and task crew personnel, together with the ordnance material and cable, to the testing sites where the engineers and project personnel plant and recover ordnance devices and conduct airdrop operations.
The boat crew also operates boats to spot aircraft, to act as safety boats around other operations, and to act as patrol *895 craft to warn off other vessels whose courses would interfere with the testing operations. While the boat crew will occasionally lend a hand if asked, in general they handle very little ordnance material.
10. Either the task crew or the boat crew operates the cable reeler on the large buoy boat (No. 6ND-146). Otherwise the task crew personnel operate the cable machinery and reels and handle the cable. The task crew personnel perform all cable repairing. One of the vessels, the tdt-9, acts as a communications center for the pilots of planes involved in airdrops of underwater ordnance devices. The tdt-9 performs functions necessary for the operation and safety of skin-divers employed in the planting and recovering of the devices and laying and repairing the cables.
11. The Motorboat Captains.
a. The captain is solely responsible for the safety and operation of the boat to which he is assigned. He retains this responsibility until expressly relieved by duly constituted authority.
The captain is the commanding officer of the vessel and supervises and instructs the crew in the proper performance of their duties. He maintains boat logs, boat reports, operating data sheets and reports of accidents. He must evaluate and utilize, according to his best judgment, information and data furnished to him by persons aboard the vessel relative to the operation of the vessel.
If a steamship, fishing, pleasure craft, or other vessel not part of the NOlte fleet comes into the area where the koltf vessels are functioning in such a manner as to endanger the operation physically or technically, vessels from the xtoltf flotilla when functioning as picket boats will intercept the intruding vessel and warn it off by suitable means, or the captain of tdt-9 will try to communicate with the intruding vessel by radio, blinker light, bull horn, or other means.
b. The position of motorboat captain is defined in the Definitions of Cwiliam, Ungraded Ratings Navexos, P-100566S {5/59), Laborer, Helper, and Mechóme Service, Group III, as follows:
*896 MOTORBOAT CAPTAIN

Bating Summary

Operates a diesel or gasoline motorboat which is 40 feet or more in length and which requires an engineman as a member of its crew; or a motorboat or more than 225 horsepower, regardless of its length or the makeup of its crew.
c. Plaintiffs Stanley B. Brooks, John W. Ennis, Earl E. McCoid, Charles B. Boof, and Thomas W. Gilham were motorboat captains. Their licenses were subject to suspension or revocation by the U.S. Coast Guard for negligence, misfeasance, misconduct, or inattention to duty. 46 U.S.C. § 239; 46 U.S.C. § 526 f.; 46 C.F.R. § 137 et seq.; 46 C.F.R. § 10.20. NOltu required the motorboat captains to possess a U.S. Coast Guard license as a condition of employment and to renew the license when it expired at five-year intervals.
12. The Enginemen.
a. The chief engineman and assistant enginemen are responsible for the vessel’s engine plant and for maintaining all equipment aboard. The enginemen start all topside machinery and check its operation; they cast off and bring in the lines; they start and prime all auxiliary equipment; they maintain pressures in the air compressors. The enginemen are also in charge of operating the anchoring machinery. There are three major anchors on the ydt-9 — one forward, one on the portside of the main deck, and one aft. There is also a capstan on the starboard quarter of the ‘tdt-9 for inhauling on a fixed mooring. Each of the smaller craft has a six-inch capstan which is used for putting equipment over the side into the water; these capstans are not used for anchoring. The enginemen maintain an engineer’s log.
b. The position of marine engineman is defined in the Definitions of Oivilia/n Ungraded Ratings navexos P-1005-562(5/59), Laborer, Helper, and Mechanic Service Group III, as follows:
MARINE ENGINEMAN

Bating Summary

Operates, maintains, and makes repairs and adjustments to the main and auxiliary engines and other *897 machinery of steam or diesel-powered tugs, ferries, large motorboats, or other craft having one or more engines of greater than 225 horsepower. Serves as a crew member on one or more such craft.
13. The Ordnancemen.
a. The ordnancemen are responsible for all the ordnance work aboard the vessel. This includes the following: rigging the crane and the cross-deck winch; planting and recovering mines, cables, buoys, and anchors; and lowering and raising the underwater television system and the clamshell bucket. While ordnance work is in progress over the side, the ord-nancemen are required to provide information relative to the direction lead of wire ropes and cables, the direction of and distance to buoys and other objects in the water, and other items of interest to the captain. The ordnancemen maintain an ordnance log.
b. Three types of ordnancemen are included among the plaintiffs, i.e., ordnance equipment mechanic, ordnanceman (inert materials), and ordnanceman (A & E Test).
c. The position of ordnance equipment mechanic is included in the Definitions of Civilian Ungraded Ratings Navexos P-1005-007, Laborer, Helper and Mechanic Service Group III, as follows:
ORDNANCE EQUIPMENT MECHANIC

Rating Summary

Overhauls, modifies, and repairs defective mechanical elements of ordnance equipment; tests and measures the operating characteristics of such elements; maintains and calibrates the testing and measuring devices and constructs special mechanical testing units.
d. The position of “ordnanceman (inert materials)” is defined in the Definitions of Civilian Ungraded Ratings navexos P-1005-023, Laborer, Helper and Mechanic Service, Group III, as follows:
ORDNANCEMAN (INERT MATERIALS)

Rating Summary

Performs a variety of duties in connection with cleaning, identifying, disassembling, assembling, pre *898 serving, and packaging inert ordnance material in preparation for shipment or storage.
e. The position of “ordnanceman (ammunition and explosives test)” is included in the Definitions of Civilian Ungraded Ratings navexos P-1005-022, Laborer, Heifer and Meoha/nie /Service, Croup III, as follows:
ORDNANCEMAN (AMMUNITION AND EXPLOSIVES TEST)

Rating Summary

Performs a variety of duties in the set-up, firing, and control of testing and experimental operations on explosives and missiles.
14. The Helpers {General).
a. The nolte has no personnel bearing the title of deckhand. These persons are known as “helpers general.” They work with the journeymen handling lines, holding, handing tools, doing routine maintenance on machinery, cleaning paint and painting, returning gear to lockers, etc.
■b. The position of “Helper (General)” is included in Definitions of Civilian Ungraded Ratings navexos P-1005-232, Laborer, Helper and Mechanic Service, Group II, as follows:
HELPER (GENERAL)

Rating Summary

Assists journeymen in two or more trades, keeping them supplied with tools and work materials, engaging in point operations with journeymen as instructed, and performing simpler elements of the trades, or performs duties of helper type and level in work where no specific trade is involved.
15. Following the Eating Summary in each of the above job descriptions, a more detailed and specific description of duties is included under the heading “Typical Work Performed.” These have all been stipulated to by the parties, and there appears to be no dispute regarding them. These detailed descriptions have not been reproduced herein be *899 cause they seem to have little, if any, relevance to the issue involved.[1]
16. The regular hours of work for the plaintiffs at all times pertinent hereto, were and are 7 :30 a.m. to 4:00 p.m., Monday through Friday. On October 18, 1964, the Officer in Charge, Nolte, issued Instruction 5330.1 in which it was stated to be the policy of the NOlte to allow each employee one-half hour for lunch between the hours of 11:00 a.m. and 1:00 p.m. The Instruction continued:
It is the responsibility of supervisors to make certain that the one-half hour lunch period is allowed daily to each employee under his supervision. Normally, this should present no difficulty. When, however, work at sea, of necessity, extends through the entire period of 1100 to 1300, supervisors (or the senior rated employee present) must make special effort to see that each employee is relieved of his duties for the 30 minute break. Only in exceptional cases where it is not possible to relieve an employee for one-half hour during the foregoing designated periods, may consideration be given to the payment of overtime.
17. The parties reserved the right to, and did, introduce evidence with respect to the policy regarding the lunch period for the relevant times prior to 1964. Prior and subsequent to October 18, 1964, the plaintiffs’ lunch time while working at Noltf was governed by Navy Civilian Personnel Instruction 610.2-lk which provides in pertinent part:
Normally, during each 8-hour shift employees will be allowed a specified period of time off to eat lunch. A lunch period is non-work time for which neither basic nor overtime compensation is payable. P/hen a lunch period is set aside, the length of the shift or workday will be extended by the length of the non-work period. In some types of jobs it may not be administratively desirable to allow a specified period of time off for lunch. *900 For example, it may be desirable to avoid overlapping shifts when night shifts are employed, or the job may require the constant attention or availability of the employee without being relieved for lunch. In these types of cases it is proper to schedule shifts without a lunch period. Under such circumstances the employees may be permitted to eat lunch on the job when it is possible to do so without stopping or interrupting his work. When no lunch period is scheduled, the schedule shall so indicate.
18. Plaintiffs’ work at sea consisted primarily of two operations which were referred to as “cable” and “subroc.” Cable operations consisted of various tasks including cable laying and repair, mine planting, unit cable work, and ranging. Subroc is an antisubmarine weapon, and those operations consisted of firing the weapon either from a submarine or an aii-plane following which kolte personnel would recover the weapon.
19. Since there were no regular mess facilities aboard the NOlte vessels participating in the aforesaid operations, plaintiffs carried their lunches with them. While the nature of the NOLtf operations were such that no definite lunch period could be scheduled, it was generally understood that, sometime during the middle of the day, each employee would be given a one-half hour period free of physical duties in which to eat his lunch. Prior to October 18,1964, this policy was an oral one which was explained to each new employee during an indoctrination session with a superior officer.
The record clearly shows that, except for infrequent interruptions caused by emergencies or other unexpected occurrences, the plaintiffs were always able to spend one-half hour eating lunch without being called upon to pex-form any physical duties. This does not mean, of course, that plaintiffs were relieved of their respective responsibilities. At all times while they were at sea, the captains and enginemen had responsibility for the safety of their vessel and its equipment. The task crews at all times had responsibility to respond to an order from a superior even if they happened to be eating at the time. As stated, however, interruptions of the lunch period were rare. The nature of the cable and subroc operations were such that substantial waiting periods were in *901 volved during which the crew members could sit down and eat. Since a constant lookout was required, however, not >all of the crew could eat at the same time.
20. Commencing in late 1963, some of the plaintiffs complained to their Immediate supervisor that they were not being given a definite lunch break. These complaints do not appear ever to have been formalized by any of the plaintiffs, nor were any written grievances filed. It may be inferred, however, that these complaints caused, or contributed to, the issuance of Instruction 5330.1 by the officer in charge. See finding 16, supra. Subsequent to the issuance of that Instruction, plaintiffs at various times have requested overtime through their supervisors. In many cases, the appropriate official has approved such requests, particularly if it involved an employee who was required to eat his lunch outside the 11:00 a.m.-l :00 p.m. period established by the Instruction.
Ultímate FikdiNgs AND CONCLUSIONS
21. The governing statutes involved in this dispute are 5 U.S.C. §§ 673c and 913 (1964 ed.) (codified in 1966 as 5 U.S.C. §§ 5544 and 6102) which provide in pertinent part as follows:[2]
§673c. Restoration of wage rates; adjustment of weeJcly rates a/rd hows of employees.
The weekly compensation, minus any general percentage reduction which may be prescribed by Act of Congress, for the several trades and occupations, which is set by wage boards or other wage-fixing authorities, shall be re-established and maintained at rates not lower than necessary to restore the full weekly earnings of such employees in accordance with the full-time weekly earn *902 ings under the respective wage schedules in effect on June 1,1932: Provided, That the regular hours of labor are established at not more than eight per day or forty per week, but work in excess of such hours shall be permitted when administratively determined to be in the public interest: Provided further, That overtime work in excess of eight hours per day or in excess of forty hours per week shall be compensated for at not less than time and one-half the basic rate of compensation, except that employees subject to this section who are regularly required to remain at or within the confines of their post of duty in excess of eight hours per day in a standby or on-call status shall be paid overtime rates only for hours of duty, exclusive of eating and sleeping time, in excess of forty per week. * * *
‡ ‡ *
§ 913. Payment of overtime to wage-board employees; computation.
Employees whose basic rate of compensation is fixed on an annual or monthly basis and adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose shall be entitled to overtime pay in accordance with the provisions of section 673c of this title. * * *
22. During operations at sea, these plaintiffs were required to be aboard their respective vessels from 7:30 a.m. to 4:00 p.m., a period of 8% hours. At first blush, therefore, the second proviso of 6 U.S.C. § 673c, supra, would seem to require the payment to plaintiffs of one-half hour overtime per day at sea. However, it is noteworthy that the proviso excludes from its operation “eating and sleeping time.” Since the record here supports the ultimate finding that, except in rare instances, these plaintiffs had one-half hour in which to eat their lunches free of physical duties, their claim for overtime under 5 U.S.C. § 673c cannot be sustained.
23. Plaintiffs point out, however, that, apart and aside from any performance of physical duties during their half-hour lunch period, they were at no time free of their responsibilities. It is true, particularly in the case of the captains and enginemen, that during the entire 8%-hour period at sea they bore continuous responsibility for the safety of the vessel, its crew, and its equipment. This fact alone, however, *903 does not bring the overtime pay statute into operation. As was stated in Bowling v. United States, 181 Ct. Cl. 968 (1967) at p. 980:
It is settled that the mere fact that an employee is required to eat lunch on the employer’s premises and to be m a duty status and subject to call during such period, does not automatically make such period “overtime”. The actual performance of substantial duties during such period is a prerequisite to recovery. * * *
As in Bowling, the record here does not support the performance of such duties by plaintiffs during the claim period involved. See, also, Bantom, v. United States, 165 Ct. Cl. 312, 320 (1964), cert. denied, 379 U.S. 890; Ayres v. United States, 186 Ct. Cl. 350, 355 (1968); and Detling v. United States, 193 Ct. Cl. 125, 432 F. 2d 462 (1970), and cases cited therein. Cf. Albright v. United States, 161 Ct. Cl. 356, 361-362 (1963) where security guards were allowed overtime for early reporting without offset for eating time because the guards “were walking post while they were eating.” 161 Ct. Cl. 362.
CONCLUSION OF LAW
Upon the foregoing findings of fact and conclusions of law which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and the petitions are dismissed.

 Counsel for plaintiffs has requested findings -with respect to these details of plaintiffs’ duties. The only reason one can surmise for these requested findings Is that plaintiffs are endeavoring to show that their duties were so numerous as to Infer that during their 8% hours at sea, there was simply no free time for a lunch period. However, as will be seen below, the record will not support the desired Inference.

 The enginemen plaintiffs claim in the alternative that defendant has violated section 202(8) of the Classification Act of 1949, as amended, 5 U.S.C. § 5342 (1996 Codification) in that defendant has failed to fix their compensation “in accordance -with prevailing rates and practices in the maritime industry.” However, these plaintiffs would equate their situations to those of licensed engineers serving and living aboard seagoing cargo vessels and tankers for relatively long periods of time. In the case of these plaintiffs who return to their homes at the end of each working day, there is no comparability to the working conditions of the licensed maritime personnel referred to above. It is the settled rule that section 202(8), sttpra, applies only upon a showing of “prevailing maritime industry practices in situations comparable to their own.” Ayres v. United States, 186 Ct. Cl. 350, 359 (1968).