PER CURIAM:
This case comes before the court on plaintiffs’ exceptions to the recommended decision of Trial Judge Francis C. Browne, filed December 23, 1977, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon *604 consideration thereof, since the court agrees with the trial judge’s recommended decision, as hereinafter set forth,* it hereby affirms and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded as a matter of law that the plaintiffs are not entitled to recover and the petition is dismissed.
OPINION OF TRIAL JUDGE
BROWNE, Trial Judge:
This action has been brought jointly by 14 plaintiffs. With one exception,[1] plaintiffs in this case have been employed either as captains or engineers aboard picket boats which guard the perimeter of restricted waters of the Chesapeake Bay in the vicinity of Aberdeen Proving Ground, Aberdeen, Maryland. Plaintiffs claim that their hours of work during the period from March 20, 1969 to March 20, 1975, (the "claim period”), were such that each plaintiff is legally entitled to one-half hour of overtime pay for each day he served aboard a vessel during the claim period. The half-hour period in dispute is the period normally designated as the lunch period.
Jurisdiction of this court is invoked under the provisions of the Tucker Act.[2] Plaintiffs’ substantive rights concerning overtime pay are governed by Section 5544 of Title 5 of *605 the United States Code[3] and certain provisions of the Fair Labor Standards Act of 1938.[4]
Plaintiffs’ petition is dismissed for failure of proof of entitlement to the relief sought. The basis for this decision is found in the opinion and findings of fact set forth hereinafter.
I. Facts
A. Role of Patrol Boats and Plaintiffs’ Duties.
Aberdeen Proving Ground was originally established along the western shore of the Chesapeake Bay during World War I to proof-test field artillery weapons, ammunition, air defense guns, trench mortars, and railway artillery; its mission has been expanded subsequently to include the testing and development of small arms. Testing activity is currently carried out over a portion of the waters of the Chesapeake Bay on which marine traffic has been restricted (the restricted area). The restricted area extends from the northern part of Spesutie Island south to Poole’s Island and includes Bush River and Gunpowder River, which are tributaries of the Chesapeake Bay. During testing periods, the restricted waters are closed to all marine traffic, including commercial and pleasure boats. Just prior to commencement of testing operations the boats on which, plaintiffs have been employed are stationed *606 around the perimeter of the restricted area. Each boat remains at its designated station until testing operations cease unless it is required to leave its station to pursue vessels which penetrate the restricted area.
The boats are operated by the Marine Services Unit of the Range Engineering Section, Technical Support Division, Material Testing Directorate, Aberdeen Proving Ground at Aberdeen, Maryland. The Marine Services Unit operates approximately 10 such boats and one LCM to which one or more plaintiffs have been assigned from time to time. Although their primary function is to secure the restricted area, the boats have also been used from time to time to transport government personnel and equipment. The LCM has been used primarily to transport equipment by water from one area of the Proving Ground to another and is not used as a picket boat. The Marine Services Unit’s boats are of various sizes, up to 65 feet long. Each has cooking facilities consisting of a stove or hot plate, refrigerator or ice box, and running water. Sleeping facilities are also available on each boat, although not needed for performance of the prescribed duties of the personnel.
Not all boats are in operation every day of the workweek. Sometimes only six boats are on duty on a given day. On other days, when the weather is especially inclement, no boats are dispatched. The particular station to which each of the boats is assigned is generally based on the firing schedule for that particular day. At the beginning of the workday, the boats proceed to their assigned stations and drop anchor. From that position they may warn approaching boats to remain clear of the restricted area by visual signal, such as waving of the arms, or orally, by radio or loudspeaker. The boats remain at anchor unless it becomes necessary to up anchor and move to intercept an intruding boat or to perform some other prescribed duty. The crew of each boat normally consists of a captain and an engineer or, in the event of unavailability of an engineer, two captains. In view of the fact that the boats are powered with diesel engines, the starting controls of which are remote from the wheel (or cockpit), a crew of two is required to move the boat.
There are long periods when the boats are at anchor and do not have to move. There are many days when the vessels *607 do not have to be moved at all from the time they arrive at their respective stations until the time arrives to return to the dock at the end of the day.
All floating craft operators of the Marine Services Unit are required, by order of the Chief of the Range Engineering Section dated September 2, 1970, to "exercise good judgment at the helm under all situations and conditions, with regard to weather, tides, load weight, speed and area of operation” and to refrain from operating "under conditions that will knowingly endanger life and/or property.” Plaintiffs, both captains and engineers, have continuous responsibility for their own safety, as well as that of their vessel and its equipment. Their only responsibility to members of the public is to warn them of the limits of the restricted area and to apprehend violators.
The job description for a Patrol Boat Captain (Job Number A-7572) in effect during the claim period reads in pertinent part:
Major Duties
Serves as a Patrol Boat Captain assigned to any one of the gasoline or diesel powered patrol boats ranging from 40-65 feet used in patrolling the danger areas of the Chesapeake Bay, transporting personnel and equipment to and from observation or test sites, and/or the operation of an LCM-8 landing craft or self-propelled barge to transport personnel to work sites. Performs maintenance of the boats as required. In this connection performs the following duties:
1. Receives daily work assignments from supervisor such as embarking time; patrol area and other associated duties to be performed such as impact observation; or pertaining to transportation of personnel and materiel. Incumbent has command authority for the determination of water safety for the general public and commercial fishermen, and as such, is responsible for the clearance of danger zones of all unauthorized craft prior to, and during firing programs. Is responsible for preventing unauthorized entry of boats into closed water areas through interception and warning and maintaining reports of any incidents which occur. Maintains communication with tower operators for purpose of water/air safety, reports to control tower of any entry by unauthorized boats or aircraft in order that firing may be stopped until danger of hitting the craft has passed at *608 which time incumbent gives the all clear to the control tower. Extensive tact and and [sic] diplomacy is required in dealing with the general public, as well as commercial fishermen, in order to maintain and promote effective and cooperative public relations between the Aberdeen Proving Ground and surrounding communities. When required, furnishes approximate range data obtained by visual observation to control towers. The above mentioned functions require of the incumbent an extensive knowledge of navigation in waters designated as the normal range which extends from Kents Island to Spesutie Island, a distance of approximately 30 miles. Possesses thorough knowledge of water depths, underwater obstruction, lights and buoys in the upper Chesapeake Bay. Assumes responsibility for the safe and efficient operation of assigned craft when underway. Makes decisions as to method of operation and disposition of boat crews and passengers when adverse weather conditions or unusual occurrences present a hazard to navigation. Directs the activities of an engineer (or another boat captain) assigned to the boat or a second person who may be assigned during foul weather or other unusual circumstances.
2. When on patrol duty at night or during times of poor visibility the incumbent operates marine radar to scan danger areas, focusing and tunning [sic] equipment in order to obtain satisfactory pattern on scope. Maintains a continuous search of the area, observing the appearance of recurring patterns created as the signal is relayed to the scope. Must correctly interpret the various light globs on the scope to determine position, direction or course of craft or other object. If not certain makes personal investigation. When it has been ascertained that a craft is heading for or is within the danger zone, the incumbent notifies the control tower by radio to stop firing. After proper investigation and/or danger is passed the incumbent notifies the B tower that it is all-clear to fire. The above equipment is also used as an aid to navigation during night and/or poor visibility.
3. Maintains boats in a clean, safe and seaworthy condition. Paints and caulks boats. Replaces metal sheathing to hulls and makes other necessary repairs. Assists in the removal, replacement and overhauling of motors, replacing defective parts and making necessary repairs.
Performs other duties as assigned.
This job description was amended on August 17, 1971. The amendment included:
*609 2. Major Duties, unnumbered paragraph, line 3 presently reading "... Chesapeake Bay, transporting personnel and equipment to and from observation or test . . .” is changed to read ". . . Chesapeake Bay, transporting personnel, equipment and test material (including ammunition and chemical agents) to and from observation or test . . .”
3. Add to paragraph 1, line 3, after material. ", including toxic chemical agents and high explosive materials used in various test programs. Occasionally participates in test programs by furnishing visual observation data or carrying data recording instruments through gas clouds. Required to wear gas mask while gases actually pass patrol craft.”
For the same period, the job description of an Engineer, Diesel (Job Number Y-59), read:
Major Duties
Performs a variety of duties involved in maintenance, repair, and operation of gasoline and diesel powered patrol boats. Serves as assistant to Patrol Boat Captain relieving him in emergency situations.
70%
1. Maintains gasoline and diesel engines in proper operating condition. Lubricates and greases all engine room machinery. Adjusts air and fuel valves. Examines machinery to assure proper running and detect overheating. Operates the main engine and auxiliary [sic] equipment.
15%
2. Assists Patrol Boat Captain by identifying navigational aids, spotting unauthorized vessels, and detecting and removing hazards to navigation. During periods of adverse weather or at night may be required to operate marine radar to detect unauthorized vessels, and hazards or aids to navigation. Observes firings, impacts, cloud dispersion, and flight courses, and communicates visually obtained data to control tower by using two-way radio. In case of emergency, and as part of training in skilled operation of vessels, may relieve the Captain and operate the patrol boat.
10%
3. While vessel is on patrol duty has responsibility for making such necessary on-the-spot repairs as will allow the boat to return to port under power. Assists mechanics in the removal, replacement, and overhaul of gasoline and diesel engines, replacing defective parts and making necessary repairs.
*610 5%
4. Maintains boats in a clean, safe and seaworthy condition. Paints and caulks boats. * * *
Performs other duties as assigned. ■
Both boat captains and engineers are required to possess a valid United States Coast Guard license to operate the boats.
The number of commercial and pleasure boats with which the picket boats come into contact varies greatly with the station assigned, the weather, and the season. The number of private boats contacted per day has increased greatly over the years from March 20, 1969 to March 20, 1975. Yet there have been many days when no boats at all were contacted, depending upon where a picket boat was stationed. In other words, there are some stations near which there is more marine activity than around others.
B. The Designated Lunch Period.
Throughout the period at issue here, March 20, 1969 through March 20, 1975 (hereinafter referred to as "the claim period”), the basic workweek for the Marine Services Unit personnel was Monday through Friday from 0745 to 1615 with a 30-minute period scheduled for lunch. Prior to June 10, 1970, the prescribed lunch period was from 1200 to 1230 hours for both the captain and the engineer. If it was not possible to eat during this time, they ate at the earliest opportunity. It does not appear that either the captains or the engineers ever lacked a 30-minute period free from job-associated duties in which to have lunch.
From June 10, 1970 through March 20, 1975, the 30-minute, duty-free lunch period was scheduled at a specific time for each boat crew member while on station. One member of the crew was to take a lunch break from 1145 to 1215 hours, the lunch break for the other crew member being scheduled from 1215 to 1245 hours. It was left to the crew to determine which members were to take the respective breaks. The crew members on shore duty were all scheduled to take their lunch break from 1145 to 1215 hours.
All plaintiffs were advised that they were to have a one-half hour, duty-free lunch period.
*611 Generally, a crew member aboard a boat had no duties assigned by an authorized person during his lunch period. When a plaintiff was serving aboard the LCM rather than a patrol boat and the LCM was scheduled to run all day, however, the plaintiff was paid overtime for the lunch period.
During the lunch period, the picket boats were anchored at their assigned positions. While one crew member was on his lunch break, the other crew member maintained surveillance of the area and monitored the radio. It was normally possible for one man to maintain surveillance and monitor the radio during the lunch period. A crew member who was on his lunch break was not required to observe the area or perform any other job-related duty.
Plaintiffs were free to do as they pleased within the confines of the boat during their lunch period. Of course, the fact that they were restricted to the confines of the boat during the lunch hiatus limited their activities in ways which were not experienced by personnel who spent their lunchtime ashore. Nevertheless, during lunch plaintiffs could, in addition to eating, engage in activities, such as fishing, crabbing, studying or even sleeping. The evidence shows that most of the plaintiffs engaged in some of each of these activities at one time or another, but with varying frequencies.
There was usually a lull in the testing operations on the range each day. As a general rule, the lull or interruption occurred from 1200 to 1230 hours. During this time pleasure boaters and commercial fishermen were allowed to pass through the restricted area. The traffic at this time was sometimes quite heavy since this period afforded an opportunity for commercial crabbers to attend to their crab pots which lined the western shore of the restricted area. It was also an opportunity for some of the many pleasure craft in the area to get into or out of the inlets or rivers which could be reached only by penetrating the restricted area. If any of these craft remained in the testing area when the firing was ready to be resumed, plaintiffs would have to clear the area — sometimes by moving into the restricted area to contact the intruding vessel.
There were infrequent occasions when a crew member on a picket boat was called upon to perform some job- *612 associated duty during the designated lunch break. Such rare instances included emergency rescue work or pursuit of an unauthorized boat about to penetrate the restricted area. In such cases it became necessary to up anchor and get the boat under way. In those instances when a crew member’s lunch period was interrupted, he generally had an opportunity to take a one-half hour, duty-free lunch period at some other time during the day. Thus, the crew member would not be required to go all day without food.
When it became necessary to set the picket boat in motion in order to intercept a private boat entering the restricted area between 1145 and 1245 hours, the plaintiffs were required to adhere to the following procedures:
1. Permission to move the boat was to be obtained from the Range Control Tower.
2. The captain was to keep track of the time worked during the lunch period and record it in the vessel’s log.
3. The captain was to report the time worked to the Chief of the Marine Services Unit at the end of the day.
Similarly, a directive dated July 21, 1971 required an identical procedure when the crew performed any other job-related duty that was required during the lunch period.
The plaintiffs were aware that they would be compensated at overtime rate for their interrupted lunch period when permission was obtained from the control tower to move the boat and the lunch time interruption was reported to their supervisor. They actually used this procedure on occasion and, in such instances, were paid accordingly. Whenever these procedures were used, the crew members were paid at overtime rates.
Overtime compensation was paid in 15-minute minimum increments rather than for the actual time worked; that is, if less than one-quarter hour was worked, the employee would be paid for a full 15 minutes. If greater than 15 minutes was worked, the employee would be paid for a full half-hour. Nevertheless, each reported incident of overtime worked during the lunch period resulted in the employee being paid for 30 minutes of work. During the period from March 20, 1969 through March 20, 1975, the only instances of overtime reported as worked during the lunch period were:
*613 February 17, 1972 — E. Druyor, M. Druyor, Durding, Hinkle, McCraken, Sabatino, Sexton.
February 23, 1972 — Burns, E. Druyor, M. Druyor, Durding, Hinkle, McCraken.
October 3, 1972 — Downer, Hinkle.
October 5, 1972 — Durding.
November 20, 1972 — Baker, M. Druyor.
May 17, 1973 — Durding.
February 21, 1974 — Baker, Hooper.
June 13, 1974 — Baker, Downer.
June 19, 1974 — Sexton, Richardson.
There is no evidence that any of the personnel listed above failed to receive the prescribed overtime pay for the dates indicated.[5]
All movements of the picket boats to intercept a private boat penetrating the restricted area during the lunch period were to be reported to the control tower. These movements were to be recorded by the tower on clearance sheets. The control tower sheets for the period from January 1, 1974 to March 20, 1975 do' not show any movements upon which overtime could have been requested for interruptions during the lunch period. None of the plaintiffs recorded in the logs of their vessels that any overtime was worked during the designated lunch period. This was true in spite of the fact that their employer required such a record before overtime could be paid.
Mr. Owens, the Chief of the Range Engineering Section, normally monitored the radio frequency used by the boats during the lunch period, from 1145 to 1245 hours. He only heard a few instances in the last several years when there was an interruption of the lunch period of any of the crews.
There was only one instance in the latter part of 1975 when a request for overtime during a designated lunch period was made to and refused by Mr. Glenn, plaintiffs’ supervisor. He refused to submit the request to his superiors in that instance because the two crew members involved, plaintiff Sexton and plaintiff Hinkle, had left early on previous days without taking leave or pay deduction.
*614 C. Aberdeen Regulations Concerning Claims for Overtime Pay.
The organization structure, of which the Aberdeen Proving Ground (APG) is a part, consists of APG, which is under the command of the Test and Evaluation Command (TECOM), which is commanded by the Defense Armament Readiness Command (DARCOM) (formerly the Army Materiel Command), which is under the command of Headquarters, United States Army. Overtime pay for wage employees was the subject of numerous regulations from each level of the command structure at Aberdeen Proving Ground. These regulations recognized the Government’s responsibility to pay overtime wages for work in excess of 8 hours per day for any one day or in excess of 40 hours for any one workweek when such overtime was duly ordered and approved. These regulations also required that overtime be approved by appropriate officials, usually in advance.
The administrative procedure required for payment of overtime pay was, at all times pertinent to this case, well-established and well-defined. Plaintiffs have stipulated that the regulations required that all overtime be approved in advance of actual use. There have been no allegations that these regulations were harsh or unreasonable or that plaintiffs were unaware of them.
Plaintiffs’ immediate supervisor during the period at issue in this suit was Samuel E. Glenn, Chief of the Marine Services Unit. Thomas E. Owens was Chief of the Range Engineering Section at Aberdeen and was Mr. Glenn’s supervisor. John H. Conley was Chief of the Range Control Unit and also reported to Mr. Owens. None of these gentlemen had been delegated the authority to authorize or approve overtime for boat captains or engineers. Mr. Owens had authority to assign overtime that had already been approved by others, and he delegated this authority to Mr. Glenn.
Although he was aware, by virtue of a grievance filed by plaintiff Elmer Druyor prior to July 28, 1970, that there may have been general discontent among the crews of the boats because they were not given overtime compensation for the entire lunch period on each day that they served *615 aboard their vessels, Mr. Glenn was not aware of any instances (except in the cases of Mr. Sexton and Mr. Hinkle, as noted above) of employees doing substantial work during the lunch period without being appropriately compensated. Since he was the individual to whom the regulations required any such work to be reported before compensation could be made and since payment was made after each such notification, he had no reason to believe that there were any instances of uncompensated overtime during the lunch periods.
Similarly, Mr. Owens had no knowledge of unpaid overtime during the lunch period and he had no reason to believe that any job-related duties were performed during the lunch period which were not paid for at overtime rates. Mr. Conley had no knowledge whatever of any request for overtime being made by a boat crew member for work during the lunch period.
II. Issues
Prior to undertaking an analysis of the law applicable to this case, it is important to clarify the nature of plaintiffs’ complaint. They are not asking that they be given overtime compensation for certain portions of their lunch period during which they performed specific job-related duties. Rather, they claim that their lunch period is constantly, continuously and regularly interrupted by the necessity to perform job-related duties and that they should therefore be given overtime compensation for the entire lunch period everyday, whether or not they are interrupted.
This is not a case wherein defendant has completely refused to recognize and provide for overtime pay for overtime work during the lunch period. The Government has maintained a procedure by which each of plaintiffs could have made claims for overtime compensation when they performed substantial official duties during the lunch period. It was utilized by the employees and, with one possible exception,[6] resulted in overtime payment every *616 time. Plaintiffs are obviously not content with this procedure. Their dissatisfaction apparently arises from one of two sources. Either they fault the system because it does not recognize every activity which consumed their time during lunch break as substantial official duty or because it does not provide for overtime throughout the lunch period regardless of actual duty performed. In either case, the gravamen of their complaint is the same. Plaintiffs assert that they performed substantial job-related duties during the lunch period so that they are entitled to overtime pay of one-half hour for each and every day of their service on the boats.[7] Perhaps the dilemma would be resolved by having the duty hours run from 0800 to 1600 hours and thereby avoid overtime. This might not appeal to plaintiffs, however, since they might then be compensated on the basis of a 7% hour day (37% hour week), but interrupted lunch breaks, if any, would be compensated for at regular pay rates instead of overtime rates.
Only seven of the 14 plaintiffs in this case testified at the trial held in this matter. It has already been stated that the extent to which the lunch period of each individual plaintiff was interrupted by the necessity of performing substantial job-associated duties was affected by the location of each boat’s duty station, the season of the year, and the weather. Since we have no evidence concerning the traffic at each individual boat’s duty station or the climatological conditions for each day of the claim period, the lack of testimony from certain of the plaintiffs means that the court lacks evidence concerning the exact frequency and duration of lunchtime interruptions from these *617 individuals.[8] This situation has led defendant to urge that we dismiss the claims of those named plaintiffs who did not testify.[9] For the reasons stated below, we cannot adopt defendant’s position.
III. Applicable Precedents
Defendant relies on the decision of this court in Baylor v. United States, 198 Ct. Cl. 331 (1972), which dismissed the petitions of those named plaintiffs who did not testify at the trial in that case. The plaintiffs in Baylor were uniformed guards who sought to recover overtime payment alleged to have been due them ás a result of certain preshift and postshift duties they performed at the behest of their employer. In that case, plaintiffs did not claim, as do plaintiffs in the case at bar, that they, as a group, were entitled to some common or standard period of overtime pay based on an average time spent on duty. Rather, they claimed that each plaintiff should be paid for an amount of time that he, as an individual, had actually expended in performing preshift and postshift work. For that reason, the actual work performed by each named plaintiff as an individual was a crucial element of the case. The fact that the time spent by each plaintiff varied according to his individual situation, based on such factors as the location of his lockers with respect to that of his duty station, made the testimony of each plaintiff a necessity.
In Baylor, supra, the parties and the court had agreed prior to the trial that each plaintiff would be bound by the proof offered by him as to his entitlement. Id. at 342. It was agreed that the petitions of those plaintiffs who did not testify would be dismissed unless the defendant was willing to stipulate that their situation was essentially similar to that of those who did testify. Id. at 367. Since the defendant in that case refused to so stipulate and since plaintiffs’ counsel was unable to locate a number of the named *618 plaintiffs, the court lacked sufficient evidence on which to base a decision on the merits of the claims of those parties who did not testify. Those petitions were dismissed as actually or constructively abandoned. Id. at 369.
The rationale of the Baylor decision is inapplicable to the facts of the case now before this court. Initially, we note that the result in Baylor was based on an agreement between the court and the parties that is not present in this case, specifically, that the petitions of those plaintiffs who did not testify would be dismissed. But a more fundamental distinction between the Baylor case and this one is found in the disparate theories presented in each. In Baylor, each individual plaintiff requested compensation for the specific amount of time he spent on job-related duties. Here, as was explained earlier, plaintiffs demand payment for the entire half-hour lunch period for all plaintiffs for each and every day they spent on duty aboard the patrol boats. Therefore, it is not necessary to determine the exact number and duration of lunchtime interruptions experienced by each individual plaintiff. It would be enough for plaintiffs to show that interruptions of the lunch period were so frequent and extensive that the lunch break was effectively lost to them as free-time. Thus the testimony of each plaintiff goes only to show, or fail to show, the extent of interruptions experienced as a general rule. Therefore, it is not necessary that each plaintiff testify to his own individual experience, and the lack of such testimony is important only to the persuasiveness of the evidence as a whole. This is particularly true in view of the testimony to the effect that each boat was to inform the boat at the adjacent station of the presence of an unauthorized vessel approaching. In other words, the "chain” effect of their operations was such that more than one boat might be affected by a single intrusion.
For the reasons stated below, the claim plaintiffs bring to this court is, on the whole, without merit and plaintiffs cannot prevail. Plaintiffs have not shown that they performed substantial job-associated duties during any lunch period for whi'ch they were not-compensated or for which compensation was not available when requested. The evidence shows that the lunch period designated for the crews was rarely interrupted. Therefore, as a matter of *619 law, the lunchtime interruptions of record were not of such frequency or duration as to entitle plaintiffs to 30 minutes of overtime compensation for each and every day of service, whether or not interruptions occurred.
It is admitted by the Government that on some occasions overtime compensable work was performed. The evidence shows no more than this. Yet it has also been shown that the Government stood ready and willing to pay overtime compensation for any such overtime work if it had been properly documented and approved in accordance with the prevailing regulations. The boat crews have had, at all times pertinent to this case, a means by which they could receive overtime pay for any substantial job-related work performed during the lunch period or at any other time. The Government has offered to pay and has paid them for this work. Accordingly, plaintiffs are entitled to no other relief in this court.
It is not denied that, under appropriate circumstances, Government employees are entitled to overtime compensation for work performed in excess of 8 hours in any one day or more than 40 hours in any one week.[10] However, time spent eating and sleeping is not only excluded from compensable time by statute and the decisions of the United States Supreme Court,[11] but also it has been excluded from compensable working time by this court. In Rapp v. United States, 167 Ct. Cl. 852, 866, 340 F.2d 635, 642-43 (1964), the court ruled:
Generally speaking, time available for, or spent, sleeping and eating is non-compensable, even where the employee is required to be on the employer’s premises. This rule is now well established. Winsberg v. United States, [120 Ct. Cl. 511 (1951)], Gaetke, et al. v. United States, 136 Ct. Cl. 756 (1956), Collins v. United States, 141 *620 Ct. Cl. 573 (1958), Avary, et al. v. United States, 141 Ct. Cl. 577 (1958), Armstrong, et al. v. United States, 144 Ct. Cl. 659 (1959), Bean, et al. v. United States, 146 Ct. Cl. 267 (1959), Ahearn, et al. v. United States, 151 Ct. Cl. 21 (1960). The exception to this rule is where substantial labor is performed in the time set aside for sleeping and eating. Farley v. United States, 131 Ct. Cl. 776 (1955), 127 F. Supp. 562, England et al. v. United States, 133 Ct. Cl. 768 (1956), 137 F. Supp. 757. See also Collins v. United States, [141 Ct. Cl. 573 (1958)].
Similarly, in Bowling v. United States, 181 Ct. Cl. 968, 980 (1967), it was stated:
It is settled that the mere fact that an employee is required to eat lunch on the employer’s premises and to be in a duty status and subject to call during such period, does not automatically make such period "overtime”. The actual performance of substantial duties during such period is a prerequisite to recovery.
See also Bantom v. United States, 165 Ct. Cl. 312, cert. denied, 379 U.S. 890 (1964).
A detailed exposition of this well-established case law is not profitable here, however, because this case is virtually "on all fours” with and controlled by this court’s decision in Bennett v. United States, 194 Ct. Cl. 889 (1971). That case established the extent to which a lunch hour must be interrupted before the employee can be said to have done "substantial” work. The fact situation in Bennett is so nearly identical to that presented here by the crews of the Aberdeen picket boats, that plaintiffs are virtually relitigating the Bennett case.
In Bennett, the plaintiffs were civilian employees whose duty stations were aboard boats which patrolled the area near the Naval Ordnance Laboratory Testing Facility in Fort Lauderdale, Florida. Regulations pertinent to the boat crews provided that plaintiffs were to take a 30-minute duty-free, unpaid lunch period. They claimed that because they were required to keep a constant lookout and because their lunch periods were subject to interruption, they were entitled to an additional one-half hour of overtime pay for each day they served aboard the boats, whether or not there were interruptions.
The court found that:
* * * [E]xcept for infrequent interruptions caused by emergencies or other unexpected occurrences, the plain *621 tiffs were always able to spend one-half hour eating lunch without being called upon to perform any physical duties. This .does not mean, of course, that plaintiffs were relieved of their respective responsibilities. At all times while they were at sea, the captains and enginemen had responsibility for the safety of their vessel and its equipment. The task crews at all times had responsibility to respond to an order from a superior even if they happened to be eating at the time. As stated, however, interruptions of the lunch period were rare. The nature of the * * * operations were such that substantial waiting periods were involved during which the crew members could sit down and eat. Since a constant lookout was required, however, not all of the crew could eat at the same time. [194 Ct. Cl. at 900-01.]
The plaintiffs’ claim for overtime was denied in Bennett because plaintiffs, except in rare instances, always had a 30-minute, duty-free period during which they could have had their lunch and because the interruptions of the lunch hours occurred only rarely. Id. at 902.
Similarly, the Aberdeen picket boat captains and engineers may not recover in this court because they have failed to show that, in fact, their performance of substantial, job-related duties during the lunch period occurred more often than rarely. In spite of testimony of some of the plaintiffs to the contrary, the most credible evidence (e.g., the logs of the vessels and the supervisor’s overtime claim records) points to the conclusion that instances of the lunch hour being interrupted by substantial official duties were extremely infrequent.
In spite of the fact that each plaintiff was aware of the simple, brief reporting procedure which would permit almost certain payment of overtime pay for any instance of work performed during the lunch break, such reports were virtually nonexistent over the years. Instances of work during lunch were never entered into the logs of the boats even though the employees knew that this was a prerequisite to overtime payment. Instances of requested overtime were extremely rare, even though a request was tantamount to certain payment. Clearance sheets maintained by the Control Tower which would indicate any reported movement of the patrol boats during the lunch period showed no such activity. The plaintiffs’ supervisor, who normally monitored the patrol boat radio frequency, and *622 for that reason would have heard any report of lunchtime boat movements, testified that he had heard very few such transmissions in the past several years. The point is that since the plaintiffs were virtually assured of payment if and when they reported work performed during the lunch period, the fact that they made so few contemporaneous comments about such work, makes any present claim of frequent lunchtime interruptions incredible.
As in Bennett, plaintiffs were "on call” during their lunch period, but actual interruptions during this time were rare. For the most part, the duties aboard the picket boat during the lunch period — observing and monitoring the radio — could be done by one person while the other crew member was enjoying a duty-free lunch. There was no job requirement that the crew member on lunch break observe the area or monitor the radio. There was only one job which took both crew members and which might have to be done during the lunch period — moving the boat to intercept an intruder — and plaintiffs were clearly paid for this work whenever they reported it and requested payment.
In this context, it is important to remember that the law does not require that employees be given a lunch break at any particular time — or even at all. The evidence shows that when plaintiffs were unable to be free of duty during the entire time of their scheduled lunch period, they were able to avail themselves of free time for lunch at some other point in the day. As in the Bennett case, the nature of plaintiffs’ duties aboard the patrol boat were such that there were substantial waiting periods when activity on the water was slack. This time, when plaintiffs were free of most duties, sometimes used for fishing, studying or sleeping, could have been used for lunch periods. Plaintiffs may not recover overtime merely because they were not allowed to take their lunch at the designated time. If they are able to take their half-hour lunch period at some time during their 8 and one-half hours on the water, they still would have worked only 8 hours and no overtime would have been due.
Even if plaintiffs were to prove that there were more frequent interruptions of their lunch periods because of the necessity to perform substantial job-related duties, they *623 have not shown that their employer refused to pay them overtime compensation for this work. The record is clear that the Government recognized its duty to pay these plaintiffs overtime wages when they were required to perform substantial job-related duties during the lunch period. Procedures which were neither unreasonable nor cumbersome were provided through which plaintiffs could be assured of payment pursuant to legitimate claims. The evidence indicates that the defendant was fair, even generous, in approving requests for overtime pay.
Plaintiffs have failed in yet another element of their proof. In addition to their failure to show that they performed substantial work during their lunch periods and that their employer refused to compensate them appropriately for such work, they have failed to show, in terms of Section 5544, that the alleged work was performed pursuant to an order of an official authorized to give such an order. See Gaines v. United States, 158 Ct. Cl. 497, cert. denied, 371 U.S. 936 (1962). In fact, the evidence shows that they were told not to perform compensable work during the lunch period — they were ordered to take a duty-free lunch and to report instances of their inability to do so because of the press of duty. Alternatively, in the case of the Fair Labor Standards Act, plaintiffs have failed to show that their supervisors knew or had reason to know that they were performing job-related duties during their lunch period for which they were not receiving overtime compensation. See Wirtz v. Bledsoe, 365 F.2d 277 (10th Cir. 1966). Since overtime payment was offered to any employee who reported overtime to his supervisor, it was reasonable for those in positions of authority at Aberdeen to assume that the lack of such reports indicated that no overtime work was being done.
IV. Conclusion
Overtime compensation need not be paid to an employee under either Section 5544 of Title 5 of the United States Code or the Fair Labor Standards Act unless the employee has performed substantial job-related duties. Substantial job-related duties are not performed during a designated duty-free lunch period when the lunch break is interrupted *624 only rarely by the necessity of performing work. Since the evidence shows that the designated lunch period of the Aberdeen boat crews was interrupted only rarely, they may not recover overtime compensation for the entire lunch period during each day they served aboard their respective vessels.
CONCLUSION OF LAW
Upon the trial judge’s findings and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law, that the plaintiffs are not entitled to recover and the petition is dismissed.

 Whereas the court adopts the trial judge’s separate findings of fact, which are set forth in his report, filed December 23, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

 Plaintiff Barbara L. Druyor is administratrix of the estate of Marvin Lamar Druyor, deceased, who was a patrol boat captain at Aberdeen Proving Ground during a portion of the claim period. She sues for the benefit of his estate.

 Section 1491 of Title 28 of the United States Code provides in pertinent part:
"The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulations of any executive department * * *. To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. * * *” [28 U.S.C. § 1491 (1976).]

 As provided by Section 5544 of Title 5 of the United States Code (1976):
"(a) An employee whose pay is fixed and adjusted from time to time in accordance with prevailing rates under section 5343 or 5349 of this title, or by a wage board or similar administrative authority serving the same purpose, is entitled to overtime pay for overtime work in excess of 8 hours a day or 40 hours a week. However, an employee subject to this subsection who regularly is required to remain at or within the confines of his post of duty in excess of 8 hours a day in a standby or on-call status is entitled to overtime pay only for hours of duty, exclusive of eating and sleeping time, in excess of 40 a week. * * *”

 Pub. L. No. 93-259, Section 6(a)(1) redefined "employer” to include employees of the U.S. Government. Accordingly, Section 207(a)(1) of 29 U.S.C. is applicable to U.S. Government employees. That section provides:
"Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.” [29 U.S.C. § 207(a)(1) (1976)].

 It is not indicated whether overtime was claimed by more than one crew member on each boat on each date. Since one crew member would be on duty while the other was on his lunch break, it is difficult to see how both could claim overtime.

 As mentioned above, on one occasion Mr. Glenn refused to submit an overtime request for plaintiffs Sexton and Hinkle, reasoning that they were undeserving because they had left work early on previous occasions. We are not told whether this denial of overtime pay followed utilization of the procedure for claiming overtime.

 Since August 9, 1972, plaintiffs have had available to them a grievance procedure established by an agreement between the International Association of Machinists and Aerospace Workers (IAM), the exclusive bargaining agent for the wage-grade employees at Aberdeen, and the Aberdeen Proving Ground (hereinafter referred to as "the Agreement”). The Agreement provided for overtime pay in specified situations and made the grievance procedure the exclusive means of resolving disagreements between the parties as to the application and interpretation of the agreement. Prior to the existence of the Agreement, employees could make use of the Department of the Army grievance procedures in similar situations.
The defendant has claimed that plaintiffs are not entitled to relief in this court because they have not made use of the grievance procedures under the Agreement and therefore have not exhausted their administrative remedies. In view of the decision rendered on the merits of this case, it is not necessary to pass on the validity of defendant’s argument.

 Indeed, the evidence that was taken from the plaintiffs who did testify does not shed substantial light on the exact number and duration of any actual lunchtime interruptions. Rather, the testimony only concerned whether these alleged interruptions were frequent or rare.

 At trial defendant refused to stipulate that those plaintiffs who did not testify would have testified to the same effect as those who did testify had the former taken the stand.

 5 U.S.C. § 5544(a) (1976). It has not yet been decided that this court has jurisdiction over claims under the Fair Labor Standards Act of 1938 (FLSA). Although defendant has interposed no objections and no other obstacles to such jurisdiction appear from the papers filed in this case, a resolution of this question is not necessary, since we find that plaintiffs are not entitled to recover under either statutory provision.

 Section 5544 of Title 5 of the United States Code specifically excludes time spent eating or sleeping from compensable overtime. 5 U.S.C. § 5544(a) (1976). Likewise, the Supreme Court has excluded eating and sleeping time from that which is compensable under the Fair Labor Standards Act. See Skidmore v. Swift & Co., 323 U.S. 134, 139 (1944); Armour & Co. v. Wantock, 323 U.S. 126, 129 (1944).