Edward William RAPP
v.
The UNITED STATES.
Ward Roland HAWKINS
v.
The UNITED STATES.
Nos. 70-62, 121-62.

United States Court of Claims.
Oct. 16, 1964.

Edward W. Rapp, pro se in No. 70–62.

Ward R. Hawkins, pro se in No. 121–62.

William L. Davis, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, and DAVIS, Judges.

PER CURIAM:

This case was referred pursuant to Rule 57(a) to Franklin M. Stone, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in an opinion filed July 31, 1964. Plaintiffs have filed no intention to except to the commissioner's opinion and the time for so doing under the Rules of the court has expired. On September 23, 1964, defendant filed a consent to the entry of judgment for the plaintiffs and a request that the court adopt the commissioner's opinion. With minor modifications the court agrees with the commissioner's opinion and recom-

mendations and without oral argument adopts them as so modified as the basis for its judgment in the case as hereinafter set forth. Thus, plaintiff Rapp and plaintiff Hawkins are entitled to recover overtime compensation and night-pay differential for the duty officer tours served by each of them at the control center during the six-year period immediately preceding the filing of their respective petitions, but they are not entitled to recover for duty officer tours served at home, for services allegedly performed during certain Civil Defense Test Exercises, or for costs incurred in prosecuting their claims. Judgment is entered for plaintiff Rapp in No. 70–62 for $1,277.96, and for plaintiff Hawkins in No. 121–62 for $921.96.

The opinion, as modified, is as follows:

Plaintiffs, former employees of the Federal Civil Defense Administration (hereinafter referred as to "F.C.D.A.") and its successor Agency, the Office of Civil and Defense Mobilization (hereinafter sometimes referred to as the "O.C.D.M." or "Civil Defense"), seek to recover overtime compensation for certain periods they acted as "Duty Officers" outside their regular workweek, during their employment with that agency.

Section 201 of the Federal Employees Pay Act of 1945, as amended by the Federal Employees Pay Act Amendments of 1954 (68 Stat. 1109, 5 U.S.C. § 911 (1958)), hereinafter sometimes referred to as the "Pay Act", provides in pertinent part:

> "All hours of work officially ordered or approved in excess of forty hours in any administrative workweek performed by officers and employees to whom this subchapter applies shall be considered to be overtime work and compensation for such overtime work, except as otherwise provided for in this chapter, shall be at the following rates:

\* \* \* \* \* \*

The primary issue presented by these two cases, which were consolidated for trial, is whether all or part of the overtime served by plaintiffs as duty officers was "work officially ordered or approved" within the meaning of the Pay Act, supra, so as to entitle plaintiffs to the overtime compensation which they claim.

At all times material herein, both plaintiffs had permanent Civil Service status and occupied positions in the classified Civil Service. Plaintiff Rapp commenced working for Region VI of the F.C.D.A. in Denver, Colorado, on May 23, 1952, as a GS–13 Communications Officer. He was promoted to a GS–14 position on May 11, 1958. Plaintiff Hawkins commenced working for Region VI of the O.C.D.M. on November 15, 1954, as a GS–13 Transportation Officer. During their employment with the Civil Defense Agency, plaintiffs' regular workweek was 40 hours, Monday through Friday. Their regular workday was from 8:30 A.M. to 5:00 P.M., with one-half hour allowed for lunch.

The Civil Defense Agency was charged with the duty of disseminating warnings of enemy attack to the civilian population. In order to be in a constant state of readiness to perform this and other emergency functions, the Agency instituted a system of maintaining "Duty Officers" during non-work hours. Under this system, plaintiffs, during the six-year period immediately preceding the filing of their respective petitions, periodically served as duty officers outside of their regular work hours.

Generally speaking, the function of the duty officer was to receive warnings and telephone calls relating to natural disasters and other emergencies, to develop additional information if necessary, and to either take appropriate action himself or to phone one of his superiors and request advice as to the action to be taken. This duty officer function was different from, and in addition to, the normal duties of plaintiffs' respective positions.

The arrangement for duty officer coverage was changed from time to time and various directives were issued by the national office with respect thereto. At the earliest date material to the present

claims, the duty officer system was as prescribed by Emergency Operations Order No. 8, revised April 19, 1956. This order, issued by the National Administrator of the Federal Civil Defense Administration, set forth in detail the functions and responsibilities of the duty officers in different emergency situations, directed all Regional Administrators to "designate" duty officers for their respective offices and authorized these administrators to issue the required duty officer instructions. The order further provided for twenty-four hour coverage in regard to the National Headquarters of the F.C.D.A., described procedures for the "maintenance of continuous duty officer watch" and instructed the Regional Administrators to establish similar procedures in their regional offices.

On May 22, 1956, shortly after the issuance of the above-mentioned order, the Deputy Regional Administrator of the Denver Regional Office (Region VI) issued "Instructions to Duty Officers", copies of which instructions were sent to members of Region VI headquarters staff and to the National Headquarters of F.C.D.A. Section 1 of these instructions reads in pertinent part:

"Federal Civil Defense Administration Regional offices must be operational 24 hours per day. To provide 24-hour service, Duty Officers have been designated each day for all off-duty hours. * * *

* * * * * * "

Section 2 of such instructions reads:

"The Director, Operations Control Office, will issue Duty Officer rosters twice each month, designating one staff member to serve as Duty Officer during all off-duty hours during the week and on Saturday, Sunday and holidays. Such designation will be rotated on an equitable basis."

Section 3 of the instructions provides, as follows:

"On work days the duty hours are from 5:00 p. m. until 8:30 a. m. the following day. On Saturday, Sunday and holidays, the duty hours are from 8:30 a. m. until 8:30 a. m. the following day. Duty Officers will leave the office on their day of duty in sufficient time to arrive at their residence prior to 5:00 p. m. and the next morning will leave their residence after 8:30 a. m. The Duty Officer will perform his functions from his residence unless instructed otherwise in an exceptional case."

In accordance with Section 2, supra, of these instructions, "Duty Officer Rosters," signed by either the Regional Administrator or the Deputy Regional Administrator (as the acting Regional Administrator), were issued twice each month. These rosters designated one staff member to serve as duty officer during all off-duty hours during the regular workweek and on Saturday, Sunday, and holidays, and listed, next to each day of the month, the name of the employee who was to serve as duty officer on that particular day, together with his home telephone number. Plaintiffs were designated and listed on the rosters as duty officers on an average of once or twice a month. All high-grade employees (GS–9 and above) at Region VI up to, but not including, the Regional Director, at times served as duty officers.

On workdays, the duty officer hours for Region VI were from 5:00 P.M. until 8:30 A.M. the following day, and on Saturdays, Sundays, and holidays from 8:30 A.M. until 8:30 A.M. the following day. During the workweek the designated duty officer left the office early in order to arrive at his residence by 5:00 P.M. and he remained at home until 8:30 A.M. the following day.

The principal responsibility of the duty officer, when serving his tour of duty at home, was to be within hearing distance of his home telephone. As noted above, on a week-night tour of duty, the duty officer would leave the office early in order to arrive at his residence by 5:00 P.M. and would remain at home until after the beginning of the next workday. Subject to remaining within hearing distance of the telephone, plaintiffs were free to eat, sleep, read, entertain friends, and

enjoy their normal pursuits. Theoretically, the duty officer could be disturbed at any hour during the night, but there is no evidence of plaintiffs' ever having received any calls after 9:00 P.M. Moreover, the duty officer could, if necessary, leave his residence, in which case he simply had to notify his supervisor and have the Civil Defense operator divert any incoming calls to such supervisor. Plaintiff Rapp testified that when serving as duty officer, he was encouraged to take his regular office work home. As defendant points out, however, there is no indication that plaintiff Rapp would not have taken his office work home in any case, i. e., even if he had not been serving as duty officer.

During a brief period from November 2, 1956 to December 13, 1956, duty officers in Region VI were directed to remain at the Regional Office Control Center during their tours and compensatory time off was granted them for such times. Except for this period, duty officer tours (until July 18, 1958) were generally served in the employee's own home and no time off, or other compensation, was received by them.

On July 18, 1958, the system of maintaining duty officers was officially changed. On that date, all Region VI staff members were instructed by the Regional Administrator that thenceforth they were to perform their duty officer tours at the Region VI Headquarters Control Center. Employees were advised, *inter alia,* that:

\* \* \* \* \* \*

"6. Two rosters will be maintained. One roster will cover weekday assignments and the other weekends and holidays. The assignments will be rotated alphabetically to insure parity.

"7. In the event the designated Duty Officer is not available for his tour of duty *due to official or personal reasons,* he shall make arrangements for his own replacement \* \* \*. [Emphasis supplied.]

\* \* \* \* \* \* "

Under the new system, the hours for the duty officer tours remained the same, except that the 24-hour duty watch on Saturday, Sunday, and holidays was sometimes divided into two tours of duty, one from 8:30 A.M. to 5:00 P.M., and the other from 5:00 P.M. to 8:30 A.M. the following day.

The duty officer logs, which the duty officer was required to maintain, contained printed instructions relating to routine procedures to be followed, and the functions to be performed, by him at the control center. Basically, he had to make and receive various calls and perform checks of different types of communication equipment. A key component of this equipment, the "national warning system"—a long-line telephone system connected to a speaker—was tested at least two times every night; one was a scheduled test, and one an unscheduled test, the latter usually coming between two and five o'clock in the morning.

Subject to performing the prescribed duties and remaining within hearing distance of the telephone and the other communication equipment, the duty officer was allowed to sleep, eat, read or do as he pleased while on duty at the control center. However, he could not leave the center and had to have his meals there. (He could either bring food with him when he came on duty or prepare meals at the control center.) Despite a bed and cooking facilities which were provided by the Agency, the physical conditions in the basement of the control center where the duty officer was stationed were far from comfortable. The room, itself was stuffy. The national warning system had to be kept always at an audible level. The latter, together with weather teletypes, clattered away throughout the night. Plaintiff Rapp testified that he would not get more than four or five hours sleep a night and that he never " \* \* \* left that place after spending a night there without a headache."

In February of 1959, a directive was issued out of the national headquarters office of Civil Defense to all Regional

Directors [1] that "The Director [of O.C.D.M.] desires that—all regional office facilities have similar duty officer standards." In relevant part, "Basic Agency Policy" was stated to be that duty officers "shall perform their tours of duty on the premises of the regional headquarters"; that "Overtime pay is not authorized for duty officers"; and that "Compensatory leave time may be given only when the duty officer is prohibited from normal nighttime sleep due to emergencies such as natural disasters." Subsequently, Civil Defense employees were informed that the Agency would not consider duty officers to be in a "work" capacity unless an emergency arose and, hence, absent such an emergency, there would be no compensation for duty officer services.

Plaintiff Hawkins retired from the Federal service on December 31, 1959, and, thereafter, filed a claim with the General Accounting Office for overtime compensation for the duty officer tours allegedly performed by him. The Comptroller General disallowed this claim on the ground that "Duty Officer assignments are *administratively construed* to be voluntary and gratuitous, and rosters prepared and posted in advance containing the name of each employee designated to perform 'duty officer' services and the date scheduled therefor are not *administratively considered* to be official authorization in advance for the performance of overtime * * *." [Emphasis supplied.]

Plaintiff Rapp retired from the Federal service on April 21, 1961. Prior to the filing of the present suit, he took no action to recover administratively on his claim for overtime compensation.

Plaintiff Rapp filed his petition on March 5, 1962, and plaintiff Hawkins filed his on April 20, 1962.[2]

### I

In Anderson, et al. v. United States, 136 Ct.Cl. 365 (1956), this court, holding

that an "inducement" to perform the work in question was sufficient to satisfy the statutory requirement that the overtime work must be "officially ordered or approved" in order to be compensable, stated that:

"* * * An order directing the plaintiff to 'remain on duty' satisfied the requirements of the statute and the regulations that the overtime should be officially ordered or approved, in writing, although the directive neither ordered nor approved the extra duty as compensable overtime.

*       *       *       *       *       *

"In withholding written orders for or approval of the overtime, the Commissioner [of Customs] and his subordinates intended to withhold compensation for the services performed. They frankly and candidly asserted this intention, and the patrol inspectors were fully advised that extra compensation would not be paid for the extra hours. * * *

"The finding herein is that the Commissioner and his subordinates rationalized the concept of voluntary overtime into the course of conduct by which the patrol inspectors were induced to perform the overtime work. Under the circumstances, their action resulted in subterfuge, albeit subconscious. The withholding of written orders or approval reflected observance of the letter of the regulation but denial of the substance of the statute.

The principles stated in the Anderson case, supra, were reaffirmed in Adams, et al. v. United States, Ct.Cl. No. 66–59, decided July 12, 1963, and, most recently, in Jerome Byrnes, et al. v. United States, Ct.Cl. No. 496–59, decided November 15, 1963.

In Albright, et al. v. United States, Ct. Cl. No. 263–61, decided April 5, 1963, the

---

1. Details concerning the change in the name of the agency and the change in the title of the heads of regional offices from "Regional Administrator" to "Regional Director" are set forth in footnote 2 to finding 2, and footnote 7 to finding 18.

2. See footnotes 1 (finding 1) and 8 (finding 23).

court held that a "tacit expectation" that the overtime work be performed was not equivalent to the statutory requirement of "official order or approval."

In the present case, there was a great deal more than a "tacit expectation" that the work in question be performed. The documents relating to the duty officer system which emanated from the national and regional offices of the Civil Defense Agency were "orders" or "directives" and were couched in mandatory terms. The duty officer rosters, in the agency's own words, were "assignments" or "tours of duty" schedules. If the designated duty officer could not perform his scheduled tour "due to official or personal reasons" he was required to make arrangements for his own replacement. Defendant admits that plaintiffs "groused" about having to perform the duty officer tours. Moreover, there was considerable testimony that oral threats of reprisal were made by the Denver Regional Director against employees who would not perform, or who seriously objected to performing, duty officer assignments. (See finding 21.) In the language of the Byrnes case, supra, " * * * it [the expectation that the work be performed] was made so explicit in terms as to amount to inducement and compulsion." Under these circumstances, to say that the duty officer tours were "voluntarily" performed by plaintiffs is a perversion of meaning. Plaintiffs were not only "induced" to perform duty officer tours but were given reasonable and understandable grounds for fearing that they might jeopardize their positions if they did not do so. In other words, plaintiffs worked under circumstances that amounted to duress and coercion. Work performed under such circumstances is no more "voluntary" than a statement or confession in a criminal case which is extracted by threats or promises on the part of a law enforcement or prosecuting officer.

█ The statement made by the Comptroller General (in disallowing plaintiff Hawkins' claim) that "Duty Officer assignments are administratively construed to be voluntary and gratuitous

* * *" runs counter to the Federal Employees Pay Act of 1945, as amended, supra, and the decisions of this court. As stated in the Anderson case, supra,

" * * * the mandate to pay additional compensation for overtime hours, when the work was, as here, officially ordered or approved, is overriding. Once the overtime work is officially ordered or approved by responsible, authorized officials, and is performed by the employees, appropriate compensation is mandatory. * * *"

Anderson, et al. v. United States, supra, 136 Ct.Cl. p. 371. See also Adams, et al. v. United States, supra, p. 3.

In its brief to the Commissioner, defendant attempts to distinguish the Anderson and Adams cases on the ground that in those cases the employees were performing their regular office work in the overtime period while here the work of the duty officer was different from plaintiff's normal duties. It is difficult to see any legal relevance in the distinction drawn, and it would appear to be a "distinction without a difference." The present case falls squarely within the rationale of the Anderson, Adams, and Byrnes cases, supra.

█ While directing the regional office staffs to perform the duty officer tours, the national office of the Civil Defense Agency was completely candid in advising employees that overtime pay was not authorized for these tours. "This candor, however, does not relieve the Government of its responsibility under the statute to pay overtime or premium pay for authorized extra work." Byrnes, et al. v. United States, supra, p. 5.

The conclusion that the duty officer tours were "officially ordered" and "approved" within the meaning of the Federal Employees Pay Act of 1945 seems inescapable. However, for the reasons discussed hereinafter, it does not necessarily follow that all of the time served by plaintiffs in performing duty officer tours both at home and at the control center constituted "work" for which they

are entitled to compensation under the Pay Act.

## II

Defendant has not argued that, because of the "stand-by" nature of the duty officer function, none of the duty officer tours can be considered "hours of work" within the meaning of the Pay Act. Presumably, the Government acquiesces in the view of the Supreme Court that:

"* * * Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged. * * *

* * * * * *

"* * * 'Hours worked are not limited to the time spent in active labor but include time given by the employee to the employer. * * *'"

Skidmore v. Swift and Co., 323 U.S. 134, 137, 138, 65 S.Ct. 161, 163, 89 L.Ed. 124, 127. See also Winsberg v. United States, 98 F.Supp. 345, 120 Ct.Cl. 511 (1951). Defendant does, however, take the position that the duty officer tours performed at plaintiffs' *residences* were not "work" within the meaning of the Pay Act.[3]

In Armour and Co. v. Wantock, the Supreme Court, in order to determine what constituted "work", used the criterion of whether the time in question was spent "* * * predominantly for the employer's benefit or for the employees * * *" and stated that this was "* * * dependent upon all the circumstances of the case." 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118.

■ Considering the evidence summarized hereinbefore, relating to the duty officer tours served by plaintiffs, it cannot be said that they spent their time "predominantly for [their] employer's benefit" when they performed such tours at home. Those tours were not "hours of work" within the meaning of the Federal Employees Pay Act of 1945, as amended, supra, and plaintiffs are not entitled to compensation for any of the time they acted as "Duty Officer" at their homes.

■ The facts relating to the duty officer tours served by plaintiffs at the control center present an entirely different picture and justify a conclusion contrary to the one reached with respect to duty officer assignments performed at home. Clearly, plaintiffs spent their time "predominantly for [their] employer's benefit" when they performed duty officer tours at the control center. Such tours constituted overtime "hours of work" within the meaning of the Pay Act and plaintiffs are entitled to compensation therefor to the extent and in the amount concluded hereinafter.

## III

As to the number of hours of overtime worked performed by plaintiffs at the control center and the amount of compensation to which they are entitled, the following points should be made:

a. Excluding a small number of hours for which compensatory time off was granted, plaintiff Rapp served a total of 538½ overtime hours as duty officer at the control center and plaintiff Hawkins served a total of 348½ hours.

b. Plaintiffs have requested compensation for all the hours they acted as duty officer including those hours spent sleeping and eating.

■■ Generally speaking, time available for, or spent, sleeping and eating is non-compensable, even where the employee is required to be on the employer's premises. This rule is now well established. Winsberg v. United States, supra; Gaetke et al. v. United States, 145 F.Supp. 913, 136 Ct.Cl. 756 (1956); Collins v. United States, 141 Ct.Cl. 573 (1958); Avary et al. v. United States, 141 Ct.Cl. 577 (1958); Armstrong et al. v. United States, 144 Ct.Cl. 659 (1959); Bean, et al. v. United States, 175 F.Supp. 166, 146 Ct.Cl. 267 (1959); Ahearn et al. v. United States, 151 Ct.Cl. 21 (1960).

3. In view of the fact that all of the duty officer tours for which plaintiff Hawkins claims compensation were performed at the control center, this particular contention relates only to the claim of plaintiff Rapp.

The exception to this rule is where substantial labor is performed in the time set aside for sleeping and eating. Farley v. United States, 127 F.Supp. 562, 131 Ct.Cl. 776 (1955); England et al. v. United States, 137 F.Supp. 757, 133 Ct.Cl. 768 (1956). See also Collins v. United States, supra.

██ In the present case, no specific amount of time was set aside for sleeping and eating; but it is fair to say that in the normal 15-hour overnight tour or 24-hour tour, sufficient time, *during which no substantial labor had to be performed*, was available for these purposes. (One communication check during the night is not considered "substantial labor.") Moreover, if the duty officer was prevented from obtaining his normal nighttime sleep due to emergencies such as natural disasters, he could receive time off during regular business hours (see finding 19). The fact that plaintiffs' sleep may have been broken occasionally by the clattering of the communication equipment would not prevent the deduction of sleeping time. Avary et al. v. United States, supra, 141 Ct.Cl. p. 579.

Somewhat less clear is the exact number of hours which should be deducted here as sleeping and eating time. As noted above, no specific amount of time was set aside for these purposes. This court has never stated that a certain number of hours, no more and no less, should be deducted, Ahearn, et al. v. United States, supra, 151 Ct.Cl. p. 23; but the usual administrative practice has been to deduct eight hours as sleeping and eating time.

██ While defendant's position is that plaintiffs are not entitled to any recovery, it contends that if the court concludes to the contrary, then ten hours should be deducted as eating and sleeping time with respect to any overnight tours which the court finds is compensable. On the present facts, however, a deduction of eight hours would appear to be more reasonable, particularly in view of plaintiff Rapp's testimony that he would not get more than four or five hours sleep a night when on duty at the control center.

██ c. Plaintiffs served many of their tours of duty at the control center at night and they are entitled to night-pay differential in addition to regular overtime compensation.[4] Although there is no evidence as to exact hours which plaintiffs used for sleeping and eating, it is not unfair to treat the eight hours deducted, supra, as being between 6:00 P.M. and 6:00 A.M. This leaves four hours in each overnight tour to which the 10 percent night-pay differential can be applied. Plaintiff Rapp served 32 overnight tours and plaintiff Hawkins 17. Accordingly, plaintiff Rapp is entitled to night-pay differential (at the applicable rate) for 128 hours and plaintiff Hawkins for 68 hours. (See findings 25(a) and (b).)

d. In 1954, the Federal Employees Pay Act of 1945, supra, was amended to provide, *inter alia*, for the situation of employees who, not unlike plaintiffs, performed overtime services of a "stand-by" nature. The amendment in question (Section 208(a) of the Federal Employees Pay Act Amendments of 1954, 68 Stat. 1111, as amended, 5 U.S.C. 926 (1958)), reads in part:

"The head of any department * * or agency * * * *may*, with the approval of the Civil Service Commission, provide that—

"(1) any officer or employee in a position requiring him regularly to remain at, or within the confines of, his station during longer than ordinary periods of duty, a substantial part of which consists of remaining in a standby status rather than performing work, shall receive premium compensation for such duty on an annual basis in lieu of premium compensation provided by any other provisions of this chapter, * * * Premium compensation under this paragraph shall be determined as an appropriate percentage (not in excess of 25 per centum) of such part

4. See 68 Stat. 1110, 5 U.S.C. 921 (1958), footnote 12 to finding 26.

of the rate of basic compensation for any such position as does not exceed the minimum scheduled rate of basic compensation provided for grade GS–9 in the Classification Act of 1949, as amended, by taking into consideration the number of hours of actual work required in such position, the number of hours required in a standby status at or within the confines of the station, the extent to which the duties of such position are made more onerous by night or holiday work, or by being extended over periods of more than forty hours a week, and any other relative factors; * * *" [Emphasis supplied.]

The primary target of the 1954 amendment was the situation of firefighters whose basic workweek, as well as overtime duties, consisted largely of remaining in a stand-by status. The subsequent application of the amendment has been principally to these firefighters. See, for example, Bean, et al. v. United States, supra.

Unlike the firefighters, Civil Defense employees performed overtime work only one or two days per month and the 1954 amendment does not as readily fit their situation. If duty officers had been given premium compensation under this amendment, it would, of necessity, have had to have been a very small percentage of their annual compensation. The controlling fact, however, is that the amendment was made discretionary with the head of the department or agency concerned. Since the national office of the Civil Defense Agency did not exercise the discretion vested in it by the amendment and provide for annual premium compensation, and this action of the national office was not arbitrary, plaintiffs are entitled to recover here (at time and one-half) under the original provisions of the Federal Employees Pay Act of 1945, i. e., under the Pay Act as it was before the 1954 amendment.

In Byrnes, et al. v. United States, supra, this court did award premium compensation under the 1954 amendment where the agency concerned, the Alcohol and Tobacco Tax Division of the Internal Revenue Service, had not done so. In that case, however, the court found that the Alcohol and Tobacco Tax Division, after having granted 15 percent annual premium pay in all of its nine Federal regions, had arbitrarily withdrawn such pay in two of those regions. Since the agency's action here was not arbitrary, the Byrnes decision is not applicable.

e. In their respective petitions, plaintiffs requested overtime compensation—in addition to the duty officer services—for work allegedly performed during certain Civil Defense Test Exercises. No proof was adduced in this regard and this aspect of their claims must be treated as having been abandoned. Plaintiffs are likewise not entitled to recover for any services performed more than six years preceding the dates of the filing of their individual petitions.

f. Plaintiffs have requested reimbursement for costs they incurred in prosecuting their claims. Section 2412 (b) of Title 28 gives this court discretion —where "the United States puts in issue plaintiff's right to recover"—to award costs to the prevailing party " * * * from the time of joining such issue." Such costs are limited, however, to costs incurred for witnesses and fees paid to the Clerk. (See finding 27 and footnote 13 thereto.) In the present case, plaintiffs had no witness fees and the ten dollar filing fee was paid by each plaintiff prior to the "joining of issue." Hence, no costs may be awarded.

In brief summary, it is concluded as follows: The performance of the duty officer tours was officially ordered and induced by competent authority in the Civil Defense Agency. Under the Federal Employees Pay Act of 1945, compensation for hours of work "officially ordered or approved," in excess of the basic workweek, is mandatory. The Civil Defense Agency could not—by arbitrarily characterizing the duty officer tours as "voluntary"—abrogate plaintiffs' rights under the statute. The duty officer tours performed at plaintiffs' resi-

dences, however, were not "hours of work" within the meaning of the Pay Act, and plaintiffs are entitled to be compensated only for the duty officer tours performed at the control center. The 1954 amendment to the Pay Act is inapplicable, and plaintiffs are entitled to recover overtime compensation and night-pay differential under the original provisions of the Federal Employees Pay Act of 1945. In each overnight tour and each twenty-four hour tour, eight hours are deductible as sleeping and eating time and such time is not compensable. For purposes of night-pay differential, the eight hours so deducted are treated as being between 6:00 P.M. and 6:00 A.M. Plaintiffs cannot recover for services allegedly performed during certain Civil Defense Test Exercises nor for any services performed more than six years preceding the filing of their respective petitions. Costs are not allowable. In accordance with the foregoing, it is recommended that the court enter judgment for plaintiff Rapp in the amount of $1,277.96, and that it enter judgment for plaintiff Hawkins in the amount of $921.96.