Charles Robert BOWMAN, Ralph E. Burwell, Kenneth F. Palmer

v.

The UNITED STATES.

Nos. 393–82C, 394–82C and 395–82C.

United States Claims Court.

Jan. 24, 1985.

See also 1 Cl.Ct. 185.

Gregory C. Hook, Waynesburg, Pa., for plaintiffs.

M. Susan Burnett, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant. James L. Stuart, Jr., Corps of Engineers, Pittsburgh, Pa., of counsel.

## OPINION

LYDON, Judge:

█ In these consolidated civilian pay actions, plaintiffs, civilian employees of the Department of the Army, Corps of Engineers, Pittsburgh District (Corps), seek to recover overtime compensation under the provisions of 5 U.S.C. § 5544(a) (1976).[1]

Plaintiffs' position is that they are entitled to recover overtime compensation because they were required to remain on board the vessel on which they worked, during off-duty hours. Defendant, on the other hand, contends that plaintiffs were not required, within any sense of the applicable law, to remain on board the vessel during off-duty hours. Upon consideration of the entire trial record and after oral argument at the completion of the trial, the court finds that plaintiffs are not entitled to recover.

### I.

The following narrative contains the court's findings of fact.

Plaintiffs, Charles Robert Bowman (Bowman), Ralph E. Burwell (Burwell), and Ken-

neth F. Palmer (Palmer), during and throughout the 6 years preceding the filing of their complaints on August 9, 1982, worked in, on or around boats owned or used by the Corps. Plaintiffs claim that during the course of said employment they were required to remain on board the M/V (motor vessel) Chartiers even when not performing work incident to their employment. Plaintiffs seek to recover overtime compensation for those periods, during which they rarely performed work, when they were allegedly unable to leave the vessel. Plaintiffs maintain that their presence and availability on board the vessel during these off-duty periods benefited the Corps and was a burden to them.

Burwell had been employed by the Corps since 1976, and before, as a wage employee, Engineer-Diesel Electric. Burwell retired from his employment with the Corps effective January 26, 1984, although September 15, 1983, was the last day he actually performed work for the Corps. Bowman and Palmer had been employed by the Corps since 1976, and before, as wage board employees, Derrickboat Operators. Both Bowman and Palmer were employed by the Corps at time of trial. During the claim period, plaintiffs, from time to time, were required to accompany work parties up and down the Allegheny, Monongahela and Ohio Rivers. This work assignment was known as "fleet duty." These work parties performed tasks such as dredging and clearing the channel and repairing dam locks. The work party trips generally lasted for one or two weeks at a time.

Plaintiffs' duties on the rivers, mentioned above, centered on the M/V Chartiers and two derrickboats, Derrickboat Monallo II and Derrickboat No. 7. The M/V Chartiers was used to tow the derrickboats and was also used to quarter and feed the work force. The M/V Chartiers was equipped with good kitchen and dining facilities and the Monallo and the M/V Chartiers were

1. Any claim for overtime pay by plaintiffs for periods extending back more than 6 years prior to the filing of their complaints is foreclosed by the statute of limitations. 28 U.S.C. § 2501 (1982). In pay cases, a cause of action first accrues when the compensation in issue should have been received by the employee. *Beebe v. United States,* 226 Ct.Cl. 308, 324, 640 F.2d 1283, 1293 (1981).

both equipped with beds and lockers. The M/V Chartiers was in overall good to excellent condition and was repaired when needed. A cook was provided to prepare meals on the M/V Chartiers and a television set was also available on the vessel.[2] A derrickboat is a floating crane. The derrickboats were used to lift heavy equipment to and from the M/V Chartiers, other barges and boats, the shore, dams, locks and other places. They were also used to remove dead trees and other materials from the water (snagging) and in dredging operations.

From, and before, 1976, work on the river was generally conducted on a two-crew shift basis with 8 hours on (work) and 16 hours off (nonwork) for each shift, or a three-crew shift basis with each crew working 8 hours. Each crew shift included, at least, a master or pilot, an engineer and a deckhand for the M/V Chartiers, and an operator for the derrickboat. During the period from midnight (2400 hours) to 8:00 a.m. (0800 hours) the M/V Chartiers would usually be tied up somewhere with only a watchman on duty. However, if the site of the work was too far away from the Pittsburgh Engine Repair Station (PERS) a boatyard located on Neville Island, Pennsylvania (the plaintiff's duty station referred to as "home port"), to allow return travel within a reasonable time, work tours of 6 hours on and 6 hours off were also utilized prior to 1981. These shifts would begin and end as follows: 12:00 a.m. to 6:00 a.m.; 6:00 a.m. to 12:00 p.m.; 12:00 p.m. to 6:00 p.m. and 6:00 p.m. to 12:00 a.m. The record indicates that the 6 hours on—6 hours off shifts were utilized a small percentage of the time, principally on dredging and snagging operations or occasionally in an emergency repair situation which necessitated traveling a great distance to reach the trouble spot.[3] Where work was performed at a permanent location in conjunction with a shore-based work party, the 8-hour shift was customarily used. Since the beginning of 1981, however, the 8-hour shift, with 16 hours off, was the general work pattern followed except for certain emergencies when the 6-hour shift pattern was utilized.

The work shifts utilized were the result of the peculiar requirements of the work. Masters and pilots of vessels preferred the 6-hour shift pattern because piloting a vessel required continuous attention while the vessel was enroute and 6 hours at one time was a long enough duty period for this type of work.[4] Further, some masters felt

2. Plaintiffs testified that the conditions aboard the vessel were not optimal. Their complaints were that the sleeping areas were small, the recreational facilities were limited, the television suffered from poor reception, and finally the noise and vibrations on board the vessel were constant during the 6-hour on—6-hour off shifts making it difficult to sleep. Despite these complaints, the court finds that credible evidence supports the conclusion the facilities provided were reasonable and comparable to those on similar vessels in the private sector. Moreover, other members of the boat crews who served with plaintiffs testified that the conditions and accommodations aboard the vessel were reasonable and were such that one became used to them. While, for example, plaintiff Bowman testified he had difficulty sleeping on the vessel, another crew member testified he had no trouble sleeping on the vessel. Plaintiffs properly concede they are not entitled to recover overtime compensation for time available for sleeping and eating. Plaintiffs allot 8 hours for these purposes whereas defendant claims time in excess of 8 hours was available for such purposes. In view of the court's disposition of

these cases, it is not necessary to resolve this conflict.

3. The duty fleet to which plaintiffs were attached was responsible for keeping river traffic flowing smoothly on the Monongahela and Allegheny Rivers and the Ohio River as far as New Martinsville. The duties of the M/V Chartiers and the rest of the fleet included helping to repair and maintain all of the locks and dams, dredging, removing debris and pulling tows through locks under repair on all these stretches of river. This geographic area of responsibility would clearly take the fleet many miles from home port for some jobs. The evidence indicates that it was primarily on the long distance jobs that the 6-hour shifts were utilized.

4. Plaintiffs Bowman and Palmer indicated that they were far more fatigued from working the 6-hour on—6-hour off shift than they would have been working a straight 12-hour shift. Plaintiff Palmer claimed he had worked many straight 12-hour shifts. Plaintiffs Bowman and Palmer favored a straight 12-hour work shift.

the 6-hour shift made it more convenient to arrange meals. Most commercial tow boats on the rivers in question operated on a 6-hour shift pattern, known in the navigation industry as a "square shift." On the other hand, plaintiffs favored at least an 8-hour shift pattern because it permitted them a longer period, after completion of their work shift, to go home, and remain there, before having to return to their work station on the river, i.e., aboard the M/V Chartiers and the derrickboats. Plaintiffs encountered difficulty, at times, in going home after their work shift was over if they had 6 rather than 16 off-duty hours, especially if they were a considerable distance from where their cars were parked, or their work position on the river was at a spot that was isolated from highways, etc. On weekends, if there was no emergency, Corps vans were generally provided to transport plaintiffs to and from the fleet location on the river after their shift was over to the area where their cars were parked.

On the 6-hour shift tour of duty, plaintiffs were in a work status for 12 hours, with the remaining 12 hours considered off-duty status. Plaintiffs were paid for 8 hours at straight time rates and 4 hours at overtime rates. While they were paid at overtime rates for all work in excess of 8 hours per day, they were also paid at overtime rates if they performed any unscheduled work during the off-duty period except in a few instances when an individual would work over into the next shift to help out a co-worker. Unscheduled overtime was ordinarily ordered before an employee went off his work shift. The evidence indicates that throughout the claim period on those rare occasions when plaintiffs were asked, prior to completion of their work shift, to work while on off-duty status, they were paid for this work at overtime rates. They were not paid for the time they were in an off-duty status and not working.

Employees who served aboard the M/V Chartiers and the derrickboats were informed prior to assuming their fleet work duties what the conditions of employment were. The record supports a finding that all three plaintiffs were advised that while on fleet duty free quarters and meals aboard the M/V Chartiers would be provided them in lieu of any travel allowance. They were further advised of the possibility that they might be required by circumstances to spend off-duty hours on the M/V Chartiers. Indeed, plaintiff Bowman, when interviewed for his job as a derrickboat operator was told he would receive free quarters and meals on the M/V Chartiers and would not be traveling home like he had been doing in his previous job. It is fair to say, based on the record, that all the plaintiffs were aware, prior to 1976 and thereafter, of the conditions surrounding riverwork on the M/V Chartiers and the two derrickboats about which they now complain.

The record preponderates that when plaintiffs were off duty, they were not required to hold themselves in readiness to work since there was another shift scheduled to relieve them or the vessel was tied up on shore with a watchman on duty and both shifts in an off-duty status. In fact, the Master of the M/V Chartiers from 1966 until January 1983, stated that no one was required to work during off-duty hours and that he was under orders to put anyone ashore who wanted to go ashore at the end of his shift. The Master indicated that crew members were often put ashore in an outboard launch. He also stated that generally on weekends the fleet was ordinarily tied up at a dock and the crew members were provided with van transportation to the location of their cars or the home port after their shift was over.

Though there is conflicting testimony in the record regarding this fact, the record preponderates in favor of a finding that the plaintiffs were not forbidden or prevented from leaving the M/V Chartiers after completion of their work shift. Indeed, the fact that plaintiffs and other crew members frequently left the boat to either go home or to just get off the boat for various reasons is the best evidence of the fact that they were not required in any way to re-

main on the vessel.[5] The workers were free to leave the boat and in fact did so both on days when they worked the regular 8-hour shifts and on those less frequent instances when they worked the 6-hours on and 6-hours off shift.

It is true that instances occurred which made it impractical or inconvenient to leave the vessel. The location of the vessel at an isolated spot on the river at the time of completion of the work shift might make it difficult to obtain land transportation to the crew members' cars in order to allow them to return home. Further, on some of the longer repair trips on one of the three rivers the vessel might be located many miles from where their cars were parked, or the crew members were just a great distance from home, thus making it impractical or inconvenient, especially on a 6-hour shift, to try and make it home and back in time for the next work shift.

While the record makes it clear that plaintiffs, when in an off-duty status, were not required to perform any work and were generally free to leave the vessel, the plaintiffs suggested at trial that Corps supervisors and management officials attempted to hinder plaintiff's efforts to leave the vessel at the end of their work shift. Plaintiffs testified that the use of the 6-hour on—6-hour off shift was an obstacle consciously used by the Corps solely to keep them on the vessel during their off-duty hours. The totality of the record in this case, however, does not support this assertion. As mentioned previously, the record indicates that some members of the fleet duty crew favored the 6-hour pattern of work. In addition, the occasional long distance travel on the various rivers and some of the jobs the crew had to perform necessitated such work shifts. In any event, the record indicates that the work shifts utilized by the Corps reflected a rational and reasonable effort to meet the peculiar requirements of fleet duty work. *See Gaetke v. United States*, 136 Ct.Cl. 756, 758, 145 F.Supp. 913, 915 (1956).

Plaintiffs additionally pointed out that plaintiffs were only given a small per diem ($3.50) and were denied travel pay when quarters and meals were available on the M/V Chartiers. Plaintiffs felt that this denial of travel pay was designed to keep them on board during their off-duty hours. Plaintiffs also testified that they felt that quarters appeared to be more frequently available to them as skilled workers whereas the less skilled workers were authorized travel pay because there were not sufficient quarters for them. Plaintiffs felt this reflected a clear policy to keep them, the skilled employees, on board the vessel during their off-duty hours for the benefit of the Corps.

The court concludes that it was clearly reasonable to deny plaintiffs travel pay in situations where quarters and meals were provided to fleet duty employees such as plaintiffs. Moreover, it is presumed that Corps officials perform their duties in good faith. Such a presumption includes the

---

5. During trial the court inquired of one of the plaintiffs concerning the veracity of the following statement made in an affidavit by another of the plaintiffs. The statement in the affidavit read as follows:

"Plaintiffs, Burwell, Palmer and myself, [Bowman], devised many ways to get home after our regular duties had been performed, rather than stay on that miserable boat. Some of these ways included parking our vehicles as near as possible to where we had to be picked up by the Chartiers at the beginning of our shifts. After boarding, the Chartiers and derrickboat would work their way up and down the rivers, snagging, dredging or performing other operations. At the termination of our duties and being let off on shore, we would try to get someone right there on shore to take us to where we had parked our cars. If that didn't work then we would walk up to the road and hitchhike and walk to our cars. We made every effort possible to overcome the obstacles presented both by our location and by supervisors and management officials of the Pittsburgh Corps of Engineers." (Affidavit of Charles Robert Bowman, paragraph 7. *See also* Tr. 304.)

The plaintiff admitted the statement was true, but tried to restrict it to the period subsequent to 1979. However, the record contains no evidence of a change in policy regarding the crew's ability to leave the vessel after 1979. In any event, this statement, adopted by at least two plaintiffs, demonstrates that plaintiffs were not restrained by the Corps "preference," "orders," suggestions, hints, threats or obstacles from leaving the vessel at the end of their work shift.

establishment of work shifts, travel pay, meals and quarters assignments, etc. The evidence presented in this case by plaintiffs fails to overcome this presumption by inference or otherwise. *See Grover v. United States*, 200 Ct.Cl. 337, 343–44 (1973). *See also Connolly v. United States*, 1 Cl.Ct. 312, 319–20, 554 F.Supp. 1250, 1258 (1982), *aff'd in part and rev'd in part*, 716 F.2d 882 (Fed.Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

The fact that the Corps provided van transportation from time to time for plaintiffs at the end of their work shift to take them to their cars: (1) indicates that the crew members were indeed free to leave the vessel in their off-duty time, and (2) belies any motive or purpose to keep plaintiffs aboard the M/V Chartiers during their off-duty hours. The fact that the Corps, at least for a period of time, allowed deckhands to move plaintiffs' cars along the river during the deckhands' work shift so that plaintiffs could leave the vessel to go home immediately after the termination of their shift also indicates that plaintiffs were free to leave and that the Corps was *not scheming in bad faith* to keep plaintiffs on board the vessel. The decision not to allow plaintiffs to debark during their work shift to move their cars as well as sometimes not allowing deckhands to do the same was reasonable in that during a work shift employees are paid to perform their duties and taking time to move cars on shore made the workers unavailable to do their job.

Plaintiffs also testified that the pilots of the M/V Chartiers sometimes refused to put them ashore at the end of their work shifts. The record clearly indicates, and plaintiffs did not contest, that there were instances in which work requirements, water conditions, the vessel's location, etc. made docking the vessel at the shoreline impractical, if not impossible. However, if the conditions were such that they permitted the pilots to put the crew members ashore, any refusal to do so would be contrary to the Corps' management order to put anyone ashore who wished to go ashore at the end of his shift. Thus, plaintiffs were again implying that the pilots acted in bad faith. The record does not contain sufficient evidence to overcome the presumption that the pilots acted in good faith in those few instances in which they refused to take plaintiffs to shore.

Finally, at least one of the plaintiffs implied in his testimony that he was essentially on standby duty when he remained on the vessel off-duty. However, the court finds that the few instances when his (Burwell's) off-duty time was interrupted were insufficient to warrant a finding that he was on standby duty. First, in the case of 6-hour shifts, Burwell's replacement was on duty when he was off. When the 8-hour shifts were utilized his replacement was on duty for at least 8 hours after his shift. Thus in most instances he would not be needed. Second, if Burwell was considered to be on standby it can be inferred that he would not have been allowed off the ship, but it is clear that the crew members, including Burwell, were allowed to leave the vessel on their off-duty time. Moreover, from the testimony of the other two plaintiffs, the court can infer that none of the crew members were considered to be on standby when they were on the vessel, but off duty.

In filing these actions, which the court subsequently consolidated into one action due to the similarity of the claims, all three plaintiffs are seeking additional compensation for the time they were "required" to remain on board the M/V Chartiers or Monallo, exclusive of time available for sleeping and eating, for which they have not already been compensated. They contend that the time that they spent on board not performing their normal tasks both benefited defendant and burdened them and thus they should be compensated for it. Bowman is claiming that he is entitled to an additional $5,349.63 in compensation, covering the period August 8, 1976—present. Burwell claims that he is entitled to $62,915.79, covering the period August 9, 1976—October 16, 1982, for the time he remained on the vessel. And lastly, Palmer asserts that he is due additional compen-

sation of $5,896.71, covering the period January 30, 1971—October 1, 1980. After a trial on the merits and a review of the applicable case law, the court concludes that none of the plaintiffs is entitled to any additional compensation.

## II.

■ The first issue which arises in this case is whether or not plaintiffs were "required" to remain on board the vessels during these non-duty hours. In support of their claims plaintiffs rely on 5 U.S.C. § 5544(a) (1976) which provides in pertinent part:

(a) An employee whose pay is fixed and adjusted from time to time in accordance with prevailing rates under section 5343 or 5349 of this title, or by a wage board or similar administrative authority serving the same purpose, is entitled to overtime pay for overtime work in excess of 8 hours a day or 40 hours a week. However, *an employee subject to this subsection who regularly is required to remain at or within the confines of his post of duty in excess of 8 hours a day in a standby or on-call status is entitled to overtime pay only for hours of duty, exclusive of eating and sleeping time, in excess of 40 a week.* * * * [Emphasis added.]

Therefore, it is clear that plaintiffs must have been in some way "required" to remain on board the vessel during their off-duty period before they would be entitled to additional overtime pay.

A requirement to remain on board can be established in several different ways. First, there could be a written order to remain on board. *See e.g., Detling v. United States,* 193 Ct.Cl. 125, 128, 432 F.2d 462, 463 (1970); *Farley v. United States,* 131 Ct.Cl. 776, 777–78, 127 F.Supp. 562, 563 (1955). It is uncontroverted in this case that there was no such written order. Sec-

ond, the requirement to remain on board could arise from an oral order from plaintiffs' superiors. *See e.g., Albright v. United States,* 161 Ct.Cl. 356, 361 (1963). There is conflicting testimony concerning whether or not such an order was in fact given. However, the court finds that a preponderance of the evidence demonstrates that plaintiffs were not given such an order. Plaintiffs' supervisors denied that they ever gave such an order. Plaintiffs did in fact leave the vessel during their off-duty hours whenever the circumstances allowed it. Further, the testimony clearly indicates that the crew members were free during their non-duty time to sleep, eat, fish, play golf, watch T.V., go home or do whatever they wished. The record indicates that plaintiffs and the other crew members generally did partake in such activities during their off-duty time to the extent they saw fit and to the degree they were able depending on the location of the vessel. Therefore, the evidence preponderates against finding any oral order for plaintiffs to remain aboard the vessel during off-duty periods.

■ There is an additional factual basis which would support a finding that plaintiffs were "required" to remain on board the vessel. If it can be shown that plaintiffs were induced to stay on board the vessel that would be sufficient to demonstrate a "requirement" that they stay on board. *See Anderson v. United States,* 136 Ct.Cl. 365, 369 (1956); *Rapp v. United States,* 167 Ct.Cl. 852, 862–63, 340 F.2d 635, 640–41 (1964).[6] Therefore, a factual question was presented as to whether or not plaintiffs were induced by their superiors to remain on board the vessel.

Again, there was conflicting testimony on the issue of inducement. The court concludes that the record preponderates in favor of a finding that plaintiffs were not

---

6. In both *Anderson v. United States,* 136 Ct.Cl. 365 (1956) and *Rapp v. United States,* 167 Ct.Cl. 852, 340 F.2d 635 (1964), under the pertinent statutory provision of the Federal Employees Pay Act of 1945 (59 Stat. 295), the issue was whether or not the services rendered by the

plaintiffs were officially ordered or approved. This provision is not identical to the applicable statutory language in this case, but the court finds its intent to be analogous to the "requirement" language of 5 U.S.C. § 5544(a) (1976).

induced to remain on board to the degree necessary to find the equivalent of the statutory "requirement" that plaintiffs remain on the vessel. The fact that plaintiffs consistently left the boat at the conclusion of their duty shifts for various reasons strongly indicates that they were not induced to stay on board during off duty periods. The fact that other crew members testified as to their freedom to debark during their off-duty hours also evidences a lack of inducement to remain on board. This freedom to leave was available during the 6-hour on—6-hour off work days as well as regular 8-hour shift days. Clearly there were times when work circumstances or the travel distance made it impractical or inconvenient to leave the vessel for home, but the court does not find such inconvenience, inherent in such river work, equivalent to inducement. *See Mossbauer v. United States*, 541 F.2d 823, 826 (9th Cir. 1976).

█ Furthermore, plaintiffs' supervisors denied that they ever explicitly attempted to induce plaintiffs to remain on board. A tacit expectation by plaintiffs' supervisors that they remain on board is insufficient to find that they were "required" to remain on the vessel. *See Albright v. United States, supra*, 161 Ct.Cl. at 361. The expectation of superiors should be explicit in its terms in order to amount to adequate inducement or compulsion. *See Byrnes v. United States*, 163 Ct.Cl. 167, 174, 330 F.2d 986, 990 (1963); *Rapp v. United States, supra*, 167 Ct.Cl. at 863, 340 F.2d at 641. The evidence in this case shows that no behavior by plaintiffs' supervisors occurred to warrant a finding that plaintiffs were induced to remain on board the vessel during off-duty hours.

█ Plaintiffs argue that when they were working the 6-hour on and 6-hour off shifts that the 6 hour off-time was insufficient to allow the plaintiffs to leave the vessel for home and return in time for the next 6-hour duty shift and thus was equivalent to a requirement that plaintiffs remain on board for 24 hours during the days on which such shifts were utilized.

In *Baca v. United States*, 150 Ct.Cl. 70, cert. denied, 364 U.S. 892, 81 S.Ct. 224, 5 L.Ed.2d 188 (1960), the plaintiffs sought additional compensation for "off-duty" time. In *Baca*, the plaintiffs were bus drivers transporting civilian employees and military personnel to and from White Sands Proving Ground in a desert region of southern New Mexico. Their job required them to drive the buses from their hometown to the military installation from 6:00 to 8:00 a.m. and then return in the afternoon, driving from 4:00 to 6:00 p.m. The bus drivers were considered on duty until 12:00 noon to allow them to complete other additional tasks. They were considered off-duty from 12:00 noon until 4:00 p.m. During this off-duty time the management at White Sands considered the plaintiffs free to go where they wished and to do as they pleased. However, because of the isolation of White Sands and the lack of any practical means to leave the post, the plaintiffs generally spent their off-duty time at White Sands waiting for their subsequent 4:00 p.m. duties to begin.

In considering whether or not the daily 4-hour off-duty period should be considered work time, the *Baca* court recognized that there are instances in which time spent waiting to perform actual labor constitutes working time and is compensable. *Baca v. United States, supra*, 150 Ct.Cl. at 77. However, the court in *Baca* noted that the cases so holding that waiting time was compensable working time involved "situations where the employee was under orders from the employer to wait at a particular place, the employee was liable to be called upon at any moment for the performance of actual labor, and he was not at liberty to go away for the purpose of engaging in other activities of his own choice." 150 Ct.Cl. at 77 (citations omitted). The court in *Baca* did not find any of these situations to exist and this court does find them present in this case.

Before concluding that the 4-hour waiting period was not compensable in *Baca*, the court stated:

It necessarily follows that in a situation where an employee has complete freedom during a waiting period to go where he pleases and do what he pleases, so long as he is at the proper place when the time arrives for the beginning of his actual labor, the waiting time is not working time, and is not compensable. *Abbott v. United States*, 138 Ct.Cl. 459, 464, 151 F.Supp. 929 (1967). [*Baca v. United States, supra,* 150 Ct.Cl. at 78.][7]

The holding in *Baca* denying the compensability of the 4-hour waiting period combined with the facts in this case weigh against compensating plaintiff for the 6-hour off-duty periods during a 6-hour on—6-hour off shift days. The record in this case preponderates that plaintiffs were generally free to leave the boat or to do as they pleased during their off-duty hours. The facts indicate that the crew members indeed left the boat during their 6-hour off-duty time or remained on the boat and watched television, fished, slept, ate and generally did as they wished. Therefore, based on *Baca v. United States, supra,* and the facts in this case, plaintiffs are not entitled to be compensated for their off-duty time on the 6-hour shift work days.

Plaintiffs contend that their off-duty periods benefited the government. A similar argument was rejected in *Baca v. United States, supra,* 150 Ct.Cl. at 78. "Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case." *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944). In *Armour & Co. v. Wantock,* the plaintiffs were firefighters who were required to remain on call in the fire hall during their off-duty hours. They were not at liberty to leave the fire hall. Based on the circumstances in that case, the Supreme Court held that the firefighters were entitled to compensation for the time they were on standby.

The circumstances in this case, however, differ. The facts in this case establish that plaintiffs were at liberty to leave the vessel on their off-duty hours. The facts indicate that plaintiffs did indeed leave the vessel during the off-duty hours. Additionally, the record shows that plaintiffs were not on standby duty. The instances when plaintiffs were required to work during their off-duty hours were rare and occurred predominately in emergency situations. In such emergency situations when plaintiffs were required to work overtime the facts indicate that they were paid for such time.

When plaintiffs were unable to leave the vessel such instances were precipitated by conditions inherent in working on a boat and not by a requirement that they remain on board for the benefit of defendant. As the court stated in *Baca v. United States:* "Their [the plaintiffs'] election generally to remain at White Sands during the 4-hour waiting periods was not predominantly for the benefit of the government, but, instead, was due to the isolation of the post in a desert area and the inconvenience of going elsewhere." *Baca v. United States, supra,* 150 Ct.Cl. at 78. *See also Mossbauer v. United States, supra.* Similarly, in this case, the times when plaintiffs could not go to their homes during off-duty hours were dictated by the nature of the work and were the practical results of the remote location of the boat during off-duty hours

---

7. The court does take note of the fact that the plaintiffs in *Baca v. United States* were compensated for a portion of their off-duty, waiting time. The court based its decision to award some additional compensation on the fact that when the plaintiffs drove their buses on some routes "the periods of waiting time that intervened between periods of actual work were not long enough to permit the driver to leave the post for the purpose of engaging effectively in activities of his own choice, and this would have been so even if White Sands had not been locat- ed in an isolated desert region." *Baca v. United States,* 150 Ct.Cl. 70, 82 (1962). The plaintiffs were thus spending their off-duty time getting ready to perform their next tour of duty. *Id.* However, the *Baca* court found that 4 hours was sufficient time to allow the plaintiffs to do as they wished despite their isolated location. In this case the court finds the 6-hour off-duty period adequate to allow the plaintiffs to leave the boat or do as they wished to the extent that they should not be compensated for that off- duty time.

and/or the lack of available transportation. Therefore, the few instances in which plaintiffs could not leave the vessel were not for the benefit of defendant and are not compensable.

 One final means by which plaintiffs could have demonstrated that they were entitled to additional compensation for their non-duty hours would have been to show that they performed substantial amounts of work during their off-duty hours. *See Bowling v. United States,* 181 Ct.Cl. 968, 980 (1967); *Rapp v. United States, supra,* 167 Ct.Cl. at 866, 340 F.2d at 643; *Ahearn v. United States,* 142 Ct.Cl. 309, 312 (1958). The record in this case suggests that, at best, plaintiffs may have worked a negligible amount of time during their off-duty hours for which they were not compensated and certainly insufficient hours to warrant a finding that they were on standby status over the 6-year period involved in this case. The amount of overtime work plaintiffs may have performed during off-duty hours was of such an insignificant amount that it is disregarded under the de minimus rule. *See Ahearn v. United States, supra,* 142 Ct.Cl. at 312. *See also Baker v. United States,* 218 Ct.Cl. 602 (1978); *Baca v. United States, supra,* 150 Ct.Cl. at 78; *Armstrong v. United States,* 144 Ct.Cl. 659, 665, *cert. denied,* 361 U.S. 825, 80 S.Ct. 72, 4 L.Ed.2d 68 (1959).

Upon consideration of the trial record and the briefs and oral argument of counsel, the court concludes that plaintiffs neither established by a preponderance of the evidence that they were required to remain on board the vessel during their off-duty hours, nor did they establish that they performed any significant amount of work during their non-duty hours throughout the claim period. Such a failure of proof precludes any recovery by plaintiffs. *See Baker v. United States, supra,* 218 Ct.Cl. at 621.

### III.

As a result of the above findings of fact and discussion relative thereto, it is concluded that plaintiffs are not entitled to recover and, accordingly, each of the petitions (complaints) in these consolidated cases is to be dismissed.